# Illinois Official Reports

## Appellate Court

---

### *People v. Robinson*, 2021 IL App (1st) 171371

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TREONDOUS ROBINSON, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-17-1371 |
| Filed | March 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-5937; the Hon. James Michael Obbish, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Phyllis Warren, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE WALKER delivered the judgment of the court, with opinion.<br>Justice Hyman concurred in the judgment and opinion.<br>Justice Pierce dissented, with opinion. |

**OPINION**

¶ 1        Defendant Treondous Robinson (Treondous), who was convicted of first degree murder, appeals from the third-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). On appeal, Treondous contends that he is entitled to a new trial because the circuit court used a legally impermissible standard, "complete vindication and total exoneration," in rejecting his claim of actual innocence and because his newly discovered evidence, when viewed against the "scant" and recanted testimony of the State's sole eyewitness at trial, makes it more probable than not that a jury would reach a different result at retrial. In the alternative, he requests a new evidentiary hearing in front of a different judge because the circuit court's order was "littered" with factual misstatements that "went to the crux" of his actual innocence claim. For the reasons that follow, we reverse and remand for a new evidentiary hearing before a different judge.

¶ 2                                    BACKGROUND

¶ 3        Treondous's conviction arose from the 1999 drive-by shooting death of Tarvis Miller in Chicago. Following a 2003 jury trial, Treondous was convicted of first degree murder and sentenced to 30 years' imprisonment. We affirmed on direct appeal. *People v. Robinson*, No. 1-04-0930 (2005) (unpublished order under Illinois Supreme Court Rule 23). Due to the nature of the claims in this appeal, we will set forth the facts adduced at trial.

¶ 4        At the jury trial, the State's theory of the case was that Treondous was the driver of the car and that he and a passenger shot and killed Miller. The defense theory was that the State's sole eyewitness, Aaron Webb, was not credible because he had multiple prior felony convictions and did not identify himself as a witness until the police tried to "put a [different] murder on him."

¶ 5        Jequita Morris testified that around 5 p.m. on May 23, 1999, she was inside her home, which was in a residential building on the 3100 block of West Polk Street, when she heard gunshots. Shortly thereafter, Kenny Morrison and Lee Johnson knocked on her door.[1] When Morris answered, she saw that Miller, who was her boyfriend, had been shot and was lying on the hallway floor. Morris called 911. Miller was taken from the scene in an ambulance.

¶ 6        A medical examiner testified that an autopsy performed on Miller revealed he suffered a gunshot wound to the left lower chest with no corresponding exit wound. A bullet was recovered from his chest. Miller also suffered a gunshot wound to his left arm. The medical examiner opined that Miller died from multiple gunshot wounds and the manner of death was homicide.

¶ 7        Webb testified that he had been incarcerated for several prior felony convictions. He was sentenced to four years in prison for a 1996 conviction for possession of a controlled substance (PCS) with intent to deliver and possession of a stolen motor vehicle, three years in prison for a 2001 conviction for PCS, two years in prison for a 2002 conviction for delivery of a lookalike substance, and two years in prison for a 2003 conviction for PCS. Webb stated that he had served his sentences and been released from prison and that the state's attorney's office had

---

[1]The parties stipulated that Morrison and Johnson were unavailable to testify because they were deceased.

not arranged for an earlier release on any of those cases. However, he was in custody at the time of trial because he disobeyed a subpoena and failed to appear in court for Treondous's case. He was told he would be released after testifying but was made no other promises in exchange for his testimony.

¶ 8    Webb testified that around 5 p.m. on May 23, 1999, he was walking westbound on Polk, toward the building where Miller was killed, where he hoped to join a dice game. From about two houses away, he saw Miller, Morrison, Johnson, and Cindy Thompson outside the building. As Webb continued walking, a black Pontiac approached from the west and stopped in front of the building. He saw Treondous, whom he had known for about 10 years, inside the car. Treondous pointed a firearm at the building and fired. Then, a man Webb knew as "Q" exited the passenger side, walked to the rear of the car, fired shots at the building, and reentered the car. As the car pulled away, another shot was fired from "the lot of [the building]." Webb went home but "at some point" returned to the scene. He did not tell the police what he saw because he did not want to be involved. In court, Webb identified a photo depicting the building and Miller's car, a blue Oldsmobile, parked on the street.

¶ 9    On February 11, 2001, while he was incarcerated, Webb had a conversation with police officers about "[s]omething else." During the conversation, Miller's murder came up indirectly, and Webb told the police what he observed. On March 2, 2001, Webb identified Treondous and Q in a photo array. On August 14, 2001, he identified Q in a lineup.

¶ 10    On cross-examination, Webb agreed that he had "been in and out" of the criminal justice system throughout his adult life and had previously given alias names to the police when arrested. He acknowledged that, when the police spoke with him on February 11, 2001, they asked him about the murder of Lawrence Gooden. However, he denied that the police were "trying to put the murder of Lawrence Gooden on [him]." Webb also acknowledged speaking with defense investigator John Rea but denied having told Rea that Detective Michael Puttin was "trying to put the shooting of Lawrence Gooden on [him]" or that Puttin tried to get him to admit involvement in that shooting.

¶ 11    On further cross-examination, Webb stated that he also saw Sidney McClendon among the group of people outside the building. He clarified that Treondous fired several shots and that Morrison, who was standing on the side of the building, was the person who shot back at the car. He did not know how many shots Morrison fired. Webb explained that two of the shots Treondous fired went through the front windows of Miller's blue Oldsmobile and agreed the shots did not "strike the car." He stated that, after Q went around to the rear of the black car, Q walked up "almost to the sidewalk" and fired several shots into the building. Webb acknowledged that in his grand jury testimony he stated Q shot Miller in his side. However, Webb did not actually see Miller get shot. Instead, he found out Miller had been shot when he returned to the scene later. Webb denied that "[s]ome of the stuff" he testified about was "things that [he] heard people say after the shooting."

¶ 12    On redirect examination, Webb testified that he never received any type of consideration in any of his own cases in exchange for his testimony in the instant case. He acknowledged that he spoke with the police about Miller's murder in 2001 and was arrested in separate cases in 2002 and 2003. According to Webb, he did not receive any "consideration" in those cases and never asked the police or prosecutors for a deal in those cases in exchange for his testimony in the instant case. He pled guilty in all his prior cases.

¶ 13    Following his testimony, Webb was released from custody on the failure to appear warrant.

- 3 -

¶ 14      Chicago police detective Michael Puttin testified that on February 11, 2001, he went to prison to interview Webb concerning the December 27, 2000, murder of Gooden. Webb was not a suspect in any investigation but rather a possible witness. He was unable to give Puttin any information about Gooden's murder. During their conversation, Puttin broached the topic of Miller's murder, even though he did not have the Miller file with him. Puttin asked Webb if he knew Miller, and Webb stated he knew Miller from the neighborhood. Puttin then asked if Webb knew anything about Miller's murder, and Webb responded he was there and saw it happen. According to Puttin, this was the first time he had any information that Webb was present at the time Miller was murdered. Webb gave Puttin the names of two possible offenders: "Treon" and "Q."

¶ 15      Following the interview with Webb, Puttin ran "Q" through the police nickname file and obtained a photo of Quentin Houston. He also obtained a photo of Treondous. On March 2, 2001, Puttin showed Webb a photo array. Webb identified Treondous's photo as "Treon," the person he saw drive a car, stick his hand out the window holding a firearm, and shoot in Miller's direction. Webb also identified Houston's photo as "Q."

¶ 16      Chicago police detective Michael D'Andrea, who was an evidence technician at the time of the shooting, investigated the crime scene. He described the area as residential and stated the building was a two-flat with vacant lots on either side. In the vestibule where Miller had been shot, D'Andrea recovered a fired bullet from a wall and two fired cartridge cases. He explained that with automatic and semiautomatic firearms, upon discharge, the cartridge casing is ejected from the weapon. D'Andrea also recovered several casings from the street, gutters, and parkway in front of the building, a fired bullet from the trunk of a Chrysler car, and a fired bullet fragment from underneath a Nissan car that sustained bullet damage on its left rear door. D'Andrea noted that a blue Oldsmobile car parked in front of the building sustained damage to both rear passenger windows. The blue Oldsmobile also had a bullet hole in its left rear fender. On cross-examination, D'Andrea stated there was no damage to the Oldsmobile's front windows.

¶ 17      The parties stipulated that, if called as a witness, Bryan Mayland, an expert in firearms identification, would have testified that he examined the recovered evidence. In his opinion, to a reasonable degree of scientific certainty, five of the fired casings recovered from the street and gutter were fired from the same .45-caliber semiautomatic weapon. Four casings recovered from the sidewalk, parkway, and vestibule were all fired from the same 9-millimeter semiautomatic weapon. The bullets recovered from the vestibule wall and Miller's body were fired from the same .45-caliber semiautomatic weapon. The bullet recovered from the Chrysler was either 9-millimeter or .38-caliber and was not fired from the same firearm as the bullets recovered from the vestibule wall and Miller's body.

¶ 18      On Treondous's behalf, McClendon testified that on May 23, 1999, he was outside the building with Miller, Morrison, Johnson, and Dashal Johnson when a black car, possibly a Chevrolet Beretta or Corsica, "pulled up and shots [were] fired out of the [car]." Everyone ran into the building's hallway but got "stuck" because the hallway had two doors, the first of which had to be pushed and the second of which had to be pulled. When the shooting ended, the car pulled away. No one exited the car. McClendon did not see Webb anywhere nearby before or during the shooting, but he stated he was not looking toward the east at the time, as he was just trying to escape the gunfire.

¶ 19 On cross-examination, McClendon acknowledged that Treondous was his friend. He stated that the car was occupied by three people—the driver, a front-seat passenger, and a back-seat passenger—and that all three were shooting. McClendon did not see the shooters' faces. According to McClendon, Morrison fired back at the car from the vestibule.

¶ 20 Defense investigator John Rea testified that he spoke with Webb on the phone on June 6, 2003. Webb told Rea that "Puttin was trying to put the Gooden case on him or words to that effect." Webb also stated the police were trying to get him to admit being involved with Gooden's shooting.

¶ 21 In closing argument, the State urged the jury to find Treondous guilty. Defense counsel encouraged the jury to doubt Webb's testimony. Counsel emphasized Webb's criminal history; argued his testimony was inconsistent, incredible, impeached, and contradicted by the physical evidence; and suggested he had a motive to lie to "get out from under the Gooden murder." Counsel further argued that the jury should believe McClendon's testimony that Webb was not present at the scene and that no one got out of the car.

¶ 22 Following deliberations, the jury found Treondous guilty of first degree murder.

¶ 23 Treondous filed a motion and supplemental motion for a new trial alleging, *inter alia*, that Webb recanted his trial testimony. Counsel attached a sworn, transcribed, and notarized statement Webb gave to counsel on October 16, 2003, 14 days after the jury's verdict. In the statement, Webb denied being threatened, coerced, or paid to come to counsel's office, and Webb stated his trial testimony that he saw Miller's shooting was not true. Webb said Puttin told him he was a suspect in Gooden's murder and "might be charged" in that case but that, if he testified against Treondous, the police "wouldn't bother [him] about" Gooden's shooting. Webb told Puttin what he "heard about" Miller's murder and testified at trial as to what he had heard. Webb stated, "I was there but I wasn't really right at the scene," that he "just heard what happened," and "I really seen it [*sic*] but I didn't see faces." He agreed that he "heard from people" that Treondous was one of the shooters. However, he did not see Treondous at the scene. Webb explained that he lied at trial about not having been threatened by Puttin because he was trying to get out of jail and he thought, if he testified about the threats, he would not be released.

¶ 24 The motion also highlighted Webb's five felony convictions. Furthermore, it alleged Webb's trial testimony was contradicted by the physical evidence and McClendon's testimony and was extensively impeached.

¶ 25 The supplemental motion alleged Puttin committed perjury when he testified that Webb was unable to provide him with information regarding the Gooden murder and where police reports showed Puttin first interviewed Webb on February 8, 2001, not February 11, 2001, as Puttin had testified. Treondous detailed the information Webb provided to the police about Gooden's murder and attached approximately 100 pages of police reports from the Gooden murder investigation.

¶ 26 At the hearing on the motion, Taneshia McGee testified that on December 28, 2000, she was contacted by Puttin regarding Gooden's murder. Puttin asked her if she knew who was in the hallway of a building on the night Gooden was killed. Puttin told her he "already knew" Gooden's shooters were Webb, Tracy Robinson, and "Yogi" but that he needed her testimony to arrest them. McGee told Puttin she did not look to see who was in the hallway. On cross-examination, McGee admitted being friends with Treondous and visiting him every week in jail.

¶ 27    The trial court denied Treondous's motion and supplemental motion. The court found the jury was aware of Webb's multiple felony convictions, the length of time between Miller's murder and Webb's first statement to the police, and that Webb was being detained for failing to appear pursuant to a subpoena. The court noted that defense counsel attacked Webb's credibility and cross-examined him about his motive to testify and whether he was only testifying as to what he "heard" and that the jury, nevertheless, found Webb credible. The court stated it found Webb's "recantation is very unpersuasive *** totally unreliable and totally inconsistent with the trial testimony."

¶ 28    The trial court also found that Puttin made some "misstatements" when he testified, such as regarding the date he first interviewed Webb and whether Webb had some information about the Gooden murder. However, the court noted that the defense could have subpoenaed police reports for the Gooden murder investigation long before it did so and that the portion of Puttin's testimony that would have been impeached involved a collateral issue.

¶ 29    The trial court subsequently sentenced Treondous to 30 years in prison.

¶ 30    On direct appeal, Treondous contended that the State failed to prove his guilt beyond a reasonable doubt because Webb's testimony was significantly impeached and uncorroborated by the physical evidence. He also contended his due process rights were violated because his conviction was based on Puttin's perjured testimony. This court affirmed. *Robinson*, No. 1-04-0930.

¶ 31    On October 9, 2013, Treondous, through private counsel, filed a postconviction petition alleging, *inter alia*, actual innocence based on a newly discovered witness, Bishara Thomas. Treondous asserted that he did not come into contact with Thomas until late 2011 and it took a "frustratingly long period of time" to secure his affidavit and "sufficient support" to file his petition. Treondous repeated in a self-executed affidavit that he "came into contact" with Thomas in 2011. In an attached affidavit dated September 23, 2013, Thomas averred that he witnessed Miller's shooting "on March 23." He stated that he saw Gooden, who was in a black Chevrolet Corsica or Beretta, shoot at Miller. A back-seat passenger, whom Thomas did not recognize but was not Treondous, also shot at Miller. Thomas recognized the third person in the car as someone he knew as "James." Thomas did not see Webb at the scene.

¶ 32    On December 13, 2013, the circuit court stated it was "docket[ing] the case for a second stage hearing." On September 8, 2014, the State filed a motion to dismiss the petition. On January 15, 2015, after hearing arguments, the circuit court advanced Treondous's claim of actual innocence to an evidentiary hearing.

¶ 33    At the evidentiary hearing, which took place on January 19, 2017, Thomas acknowledged that he had prior convictions for first degree murder, home invasion, and aggravated criminal sexual assault. In "May 1999," Thomas was walking on Polk, on his way to a store, when he saw Miller, with whom he was friends, and three other men on the 3100 block of Polk. Thomas said hello and continued walking. When Thomas was heading back from the store, walking eastward on Polk, a black Chevrolet Corsica or Beretta drove past him and pulled up in front of the building. Gooden was driving, a man Thomas knew as "James" was the front-seat passenger, and a man Thomas did not know was in the back seat. Treondous, whom Thomas knew from the neighborhood, was not the back-seat passenger. Thomas did not see Webb, whom he also knew, at the scene.

¶ 34    Thomas testified that "[s]omebody stuck their arm out from the driver's side and from the passenger side behind the driver [and] start[ed] firing in the direction of [Miller] and the other

guys that [were] out there." No one got out of the car. Someone in Miller's group fired back. Thomas ran, and he did not see Webb at the scene. Thomas found out later that Miller had been killed. He did not go to the police because he did not want to get involved.

¶ 35　In 2005, Thomas was sentenced for murder. While he was at Menard Correctional Center, he saw Treondous "a few times" but did not have direct conversations with him. He did not know why Treondous was incarcerated at the time. In 2011, Thomas spoke with a private investigator from defense counsel's office. In 2013, he signed an affidavit regarding Miller's murder after counsel reached out to him.

¶ 36　On cross-examination, Thomas stated that the car passed him while he was still a "few houses" west of the building. He then answered the following questions:

> "Q. Now, when that car passed you by, the car was coming from your back going forward, is that how it passed you by?
>
> A. Yeah, same way I was coming from.
>
> Q. So when you're looking at the car as it's passing you by, you're seeing the back of the car, correct?
>
> A. No. As it's passing me by, I'm seeing the driver and the back passenger side of the car.
>
> Q. The same side of the street you're walking on?
>
> A. No, it's the south side of the street.
>
> Q. That's the opposite side of the street?
>
> A. Yes.
>
> Q. So you're facing the passenger side of that car, correct?
>
> A. No. I'm facing—
>
> Q. Your side is on the driver's side?
>
> A. Polk is a two-way street, goes east and west.
>
> * * *
>
> Q. *** When that car passed you, what part of the car were you looking at?
>
> A. As the car passed me by, I seen the whole side of the car, driver's side of the car.
>
> Q. Then as it passed you by and went further along, what part of the car are you now looking at?
>
> A. The rear, rear part of the car."

¶ 37　Thomas clarified that, when the shooting occurred, he was in front of an apartment building that was on the other side of the vacant lot adjacent to the building in question. Thomas also stated that there were "a lot" of shots and that, when they were fired, the group in front of the building ran "[t]owards the lot and towards the inside [of] the building." After pausing, Thomas turned and ran. About 5 to 10 minutes later, he returned to the scene to find out if anyone had been shot. He saw a crowd of people, including Miller's girlfriend, and learned Miller had been shot. An ambulance arrived before Thomas left the scene. Even after learning Miller had died, Thomas did not want to get involved.

¶ 38　Thomas acknowledged that on March 23, 2001, when the police questioned him about Gooden's murder, he did not volunteer any information about Miller's murder. He stated that he was sent to Menard Correctional Center at the end of 2005 and remained housed there at the time of his testimony. In 2007 or 2008, he became aware that Treondous was being housed

in the same section of the same building. Thomas agreed that he had "regular contact" with Treondous but stated he did not find out why Treondous was there until 2011, when he heard from "other people" that Treondous was imprisoned for Miller's murder. Thomas said he never talked with Treondous about Miller's murder, explaining, "It's not like we go around and discuss our case."

¶ 39 Thomas reiterated that he had not wanted to get involved and indicated he had been worried about his family's safety. He stated that, although he knew Gooden was dead, he kept quiet because of the other two people in the car with Gooden. He stated, "I was worried about them. Doing something to my family if they found out that I am coming forth saying that they did, they killed [Miller]. *** I wasn't willing to risk my family just on [an] assumption as they may not know me."

¶ 40 Thomas did not recall how Treondous's attorney "found out" about him. Treondous did not tell Thomas that anyone was going to contact him. Thomas agreed that in 2011, "one day just out of the blue," an investigator visited him in prison. The investigator stated he learned Thomas had information about Miller's murder but did not share his source. Thomas told the investigator what he had witnessed, and the investigator took notes. Sometime later, postconviction counsel called Thomas and asked if he would be willing to sign an affidavit. Thomas thereafter received an affidavit in the mail. He was satisfied that the affidavit "summed up" what he told the investigator and signed it. Thomas agreed that the affidavit indicated the shooting occurred on March 23 and that the affidavit did not include many of the details to which he testified.

¶ 41 On redirect examination, Thomas agreed that in 2011 he received a letter from postconviction counsel explaining who he was and inquiring about what Thomas knew about Miller's death. Thomas agreed that he spoke with counsel on the phone "a couple times" and that the investigator visited him in 2013. When Thomas spoke with the investigator, he did not know the exact date of Miller's murder. Thomas further testified that, when he spoke with the police in 2001, the subject of Miller's murder was not brought up.

¶ 42 Treondous testified that he met Miller when they were teenagers but stated he did not know Webb. He denied being involved in Miller's murder. He stated he had "met" Thomas.

¶ 43 On cross-examination, Treondous agreed he had been placed in the same housing unit as Thomas in 2007 or 2008. Treondous knew who Thomas was, but they did not have conversations, and to Treondous's knowledge, Thomas did not know who he was. They did not talk about why Treondous was in prison. Treondous stated that he did not contact his attorney to talk to Thomas. When asked when he first found out Thomas might have information about his case, Treondous answered that, while he was reviewing police reports that his attorney attached to the motion for a new trial, "I noticed Bishara Thomas's name in Lawrence Gooden supplemental report along with other people. So we hired a[n] investigator [to] go and talk to all those people who—most of those people who[se] names were—if we can find them were in that supplementary [police] report." Treondous agreed he had been informed that an investigator had spoken with Thomas, but he could not recall when he received that information. He denied ever talking with Thomas about his case. Treondous first learned that Thomas had information about his case when he received a "statement" from the investigator.

¶ 44 After Treondous rested, the State entered into evidence certified copies of Thomas's prior convictions.

¶ 45    On April 26, 2017, the circuit court entered a written order denying Treondous's petition. In the order, the circuit court summarized the evidence elicited at trial and the procedural history of the case. The court set forth the law pertaining to postconviction claims of actual innocence. As part of this discussion, the court wrote, "The touchstone of actual innocence is 'total vindication' or 'exoneration,' " and cited *People v. Barnslater*, 373 Ill. App. 3d 512, 520 (2007), for that proposition. Then, after summarizing Thomas's affidavit, Thomas's testimony, and Treondous's testimony, the court set forth its findings.

¶ 46    The court stated Treondous's claim of actual innocence failed because Thomas's testimony "utterly lacked credibility." As an initial matter, the court found Thomas's credibility was severely diminished due to his prior convictions. Aside from the prior convictions, the court found Thomas's credibility "suffered from a number of issues." First, the court found Thomas had not convincingly established he was able to make an accurate and reliable identification of the car's occupants because he "only observed the vehicle on the driver's side, after the vehicle had passed him," and, therefore, "it is unclear how he would have been able to observe the faces of any of the vehicle's occupants." Second, the court found Thomas's credibility was damaged by his "actions following the shooting." Specifically, the court noted that, despite being "friends" with both Miller and Treondous, Thomas never provided information about the shooting to police, even after learning Gooden was deceased and therefore incapable of retaliation.

¶ 47    Finally, the court found Thomas's credibility was damaged "from the overall unbelievable narrative" of Thomas's and Treondous's interactions in prison. The court explained:

> "Years later, Thomas happened to find himself in the same housing unit of the same correctional facility as petitioner, where they met and had regular contact. Despite this regular contact, Thomas and petitioner claim they never once discussed petitioner's case over the course of three or four years. They were unable to provide any cause for their reticence over that information. After three or four years, petitioner, conveniently, happened to find Thomas'[s] name in a police report from the unrelated murder of Lawrence Gooden that counsel had attached to an earlier post-trial motion. For no particular reason, petitioner decided to tell defense counsel to interview Thomas. Petitioner and his counsel then learn that Thomas just so happened to be the sole witness to the murder that could exonerate petitioner. Despite making this groundbreaking discovery, petitioner and Thomas maintain that they persisted in their mutual silence about petitioner's case, leading up to the evidentiary hearing. This account contains too many convenient coincidences and what appears to be entirely aberrant behavior by Thomas and petitioner to find Thomas's testimony credible."

¶ 48    The court concluded its analysis as follows:

> "Thomas'[s] testimony, when weighed against the evidence presented at trial, falls short of providing petitioner of the complete vindication and total exoneration that are the hallmarks of an actual innocence claim. There is no basis to find that the outcome at trial could have possibl[y] differed based on the incredible account Thomas gave this Court. Accordingly, petitioner's actual innocence claim falls short."

¶ 49    Treondous filed a timely notice of appeal.

ANALYSIS

¶ 51 On appeal, Treondous contends that he is entitled to a new trial because the circuit court used an impermissible standard, "complete vindication and total exoneration," in rejecting his claim of actual innocence and because Thomas's testimony at the evidentiary hearing, when viewed against Webb's "scant" and recanted testimony at trial, makes it more probable than not that a jury would reach a different result at retrial. In the alternative, Treondous requests a new evidentiary hearing in front of a different judge because the circuit court's order was "littered" with factual misstatements that "went to the crux" of his actual innocence claim. The State responds that the record amply supports the circuit court's determination that Thomas lacked credibility. As a result, the State argues, Thomas's testimony was not of such a conclusive character that it would probably change the result at retrial.

¶ 52 In cases not involving the death penalty, the Act provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 *et seq.* (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). In the instant case, the petition advanced to a third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2016). A circuit court's decision following an evidentiary hearing, where fact-finding and credibility determinations are involved, will not be reversed unless it is manifestly erroneous (*People v. English*, 2013 IL 112890, ¶ 23), that is, unless the opposite conclusion is clearly evident (*People v. Coleman*, 2013 IL 113307, ¶ 98). However, whether a circuit court applied a proper legal standard is a question of law, which is subject to *de novo* review. *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 47.

¶ 53 A postconviction petitioner may assert a claim of actual innocence where the claim is based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Such evidence must be newly discovered, material, noncumulative, and, most important, of such conclusive character that it would probably change the result on retrial. *Id.*; *Coleman*, 2013 IL 113307, ¶ 84. Evidence is considered new where it was discovered after trial and could not have been discovered earlier through the exercise of due diligence; material where it is relevant and probative of the petitioner's innocence; noncumulative where it adds to what the jury heard; and conclusive where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 54 In this case, the State, rightly, does not contest that Thomas's affidavit is newly discovered, material, and noncumulative. Evidence is considered new if it was discovered after trial and is of such character that it could not have been discovered prior to trial by the exercise of due diligence. *People v. Smith*, 2015 IL App (1st) 140494, ¶ 19 (citing *People v. Molstad*, 101 Ill. 2d 128, 134 (1984)). Here, Treondous's trial took place in 2003. Thomas did not speak with anyone about the shooting until 2011, years after trial. In these circumstances, we find Treondous's failure to discover Thomas's information prior to trial was not due to a lack of diligence. See *id.* Evidence is material if it is "relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. Thomas's assertion that Treondous was not one of the three people in the car is certainly relevant and supports Treondous's claim that he is innocent. See *Smith*, 2015 IL App (1st) 140494, ¶ 20. Evidence is noncumulative where it adds to what the jury heard. *Coleman*, 2013 IL 113307, ¶ 96. Here, no one testified at trial that the occupants of the car were Gooden, "James," and a third man who was not Treondous. As such, Thomas's proposed testimony would add to what the jury heard. See *Smith*, 2015 IL App (1st) 140494, ¶ 20.

¶ 55    We turn to the final element of conclusiveness, which is whether the proposed new evidence, when considered along with the trial evidence, would probably lead to a different result on retrial. *Coleman*, 2013 IL 113307, ¶ 96. When addressing this element in the instant case, the circuit court stated in its written order that "[t]he touchstone of actual innocence is 'total vindication' or 'exoneration.' " It also concluded that "Thomas'[s] testimony, when weighed against the evidence presented at trial, falls short of providing petitioner of the complete vindication and total exoneration that are the hallmarks of an actual innocence claim."

¶ 56    Since the time the circuit court wrote its decision, our supreme court has held that requiring evidence of total vindication or exoneration to support a claim of actual innocence is "an incorrect standard." *People v. Robinson*, 2020 IL 123849, ¶ 55. The *Robinson* court observed that the original source of that standard was the appellate court opinion in *People v. Savory*, 309 Ill. App. 3d 408, 414-15 (1999) (cited in *Barnslater*, 373 Ill. App. 3d at 520). See *Robinson*, 2020 IL 123849, ¶ 55. However, as our supreme court explained in *Robinson*, when it reviewed *Savory*, it "specifically rejected the total vindication or exoneration standard and explained that 'evidence which is "materially relevant" to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim.' " *Id.* (quoting *People v. Savory*, 197 Ill. 2d 203, 213 (2001)).

¶ 57    In *Robinson*, our supreme court clarified that there is no requirement that the new evidence be entirely dispositive to be likely to alter the result on retrial. *Id.* ¶¶ 48, 56. "Rather," the *Robinson* court explained, "the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56. Probability, not certainty, is key in determining whether the fact finder would reach a different result after considering the trial evidence along with the new evidence. *Id.* ¶ 48.

¶ 58    Here, the circuit court employed the standard of total vindication or exoneration in rendering its decision. In light of our supreme court's subsequent holding in *Robinson* that this is "an incorrect standard," we conclude that the instant case must be reversed. *Id.* ¶ 55. However, contrary to Treondous's position, it would be improper for us to conduct our own review of the evidence under the correct standard. *In re D.T.*, 212 Ill. 2d 347, 366-67 (2004). Where a circuit court has judged evidence under an improper standard of proof, the appropriate remedy is to order a new hearing to be conducted under the proper standard. *Id.* at 367 (citing *Santosky v. Kramer*, 455 U.S. 745, 770 (1982)). Accordingly, we remand for a new third-stage evidentiary hearing.

¶ 59    The dissent opines that our reliance on *Robinson* is erroneous. In the dissent's view, the circuit court did not apply the "total vindication or exoneration" standard. Rather, the dissent states, the circuit court correctly determined that the new evidence was not of such conclusive character that it probably would change the result on retrial. The dissent would find that the circuit court here applied a proper standard by disregarding the circuit court's dual references to the "total vindication or exoneration" standard and citation to *Barnslater*.

¶ 60    Since deciding *Robinson*, the Illinois Supreme Court has issued supervisory orders in at least six cases where the appellate court employed the "total vindication or exoneration" standard in some fashion, directing that those cases be reconsidered in light of *Robinson*. See *People v. Simms*, No. 126080 (Ill. Sept. 30, 2020) (supervisory order); *People v. Galloway*, No. 124701 (Ill. Sept. 30, 2020) (supervisory order); *People v. Levi*, No. 124774 (Ill. Sept. 30,

2020) (supervisory order); *People v. Smith*, 124963 (Ill. Sept. 30, 2020) (supervisory order); *People v. Zapada*, No. 124717 (Ill. Sept. 30, 2020) (supervisory order); *People v. Miranda*, No. 123466 (Ill. Sept. 30, 2020) (supervisory order). Although the circuit court in this case gave detailed reasons explaining why it found the new evidence "utterly lacked credibility," it nevertheless twice referenced the "total vindication or exoneration" standard and cited *Barnslater*, which was, in effect, abrogated in *Robinson*. Discounting those references and finding, as the dissent would, that it is erroneous to rely on *Robinson* here would amount to disregarding our supreme court's supervisory order.

¶ 61 Treondous requests that the new third-stage evidentiary hearing be held before a different judge to avoid the appearance of any impropriety. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require. This authority includes the power to reassign a matter to a new judge on remand. See, *e.g.*, *In re Marriage of Smoller*, 218 Ill. App. 3d 340, 346-47 (1991); *People v. Austin*, 116 Ill. App. 3d 95, 101 (1983). Out of an abundance of caution, we remand the cause to the presiding judge of the criminal division of the circuit court with instructions to assign this case to a different judge to adjudicate the new third-stage postconviction proceedings.

¶ 62                                         CONCLUSION

¶ 63 For the reasons explained above, the judgment of the circuit court is reversed, and the cause is remanded for a new third-stage evidentiary hearing with directions that it be assigned to a new judge on remand.

¶ 64 Reversed and remanded with directions.

¶ 65 JUSTICE PIERCE, dissenting:

¶ 66 The majority erroneously relies on *People v. Robinson*, 2020 IL 123849, to reverse and remand for another third-stage evidentiary hearing on petitioner's successive postconviction petition claiming actual innocence based on newly discovered evidence supported by the affidavit of Bishara Thomas. While I strongly disagree that the circuit court used the wrong standard in dismissing the petition, as evidenced by the oral statement of the court and its written order, this is a review of the denial of a third-stage postconviction petition that we review for manifest error (*People v. Coleman*, 2013 IL 113307, ¶ 98), and we can affirm this order on any basis supported by the record (*People v. Lee*, 344 Ill. App. 3d 851, 853 (2003)).

¶ 67 *Robinson* dealt with the pleading requirements necessary to obtain leave to file a successive postconviction petition. *Robinson* restated the long-standing principle that the petitioner's burden differs depending on the stage of the postconviction proceeding. See *Robinson*, 2020 IL 123849, ¶ 58 ("a petitioner who requests leave to file a successive petition need not satisfy even the substantial showing burden to advance to the third stage—let alone the evidentiary burden to obtain a new trial after a third-stage hearing"). The *Robinson* court did nothing to alter the requirement that "[t]he conclusive character of the new evidence is the most important element of an actual innocence claim" (*id.* ¶ 47 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996))) and that "the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result (*id.* (citing *Coleman*, 2013 IL 113307, ¶ 96, citing *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009))).

- 12 -

¶ 68    Because this is a review of the dismissal of a successive postconviction petition after a third-stage evidentiary hearing, this appeal must be reviewed for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Reed*, 2020 IL 124940, ¶ 51.

¶ 69    The majority appears to focus on the circuit court's observation of "the complete vindication and total exoneration that are the hallmarks of an actual innocence claim," to conclude that the trial court applied the wrong standard in dismissing the petition. In my view, this is a convenient excuse to justify awarding petitioner a second bite at the third-stage postconviction apple. Taken in context, after the trial court stated that "[t]he touchstone of actual innocence is 'total vindication' or 'exoneration,' " citing *People v. Barnslater*, 373 Ill. App. 3d 512, 520 (2007), the trial court's entire statement went on to explain that this burden is not easily met and must be supported by new reliable evidence that was not present at trial. The court then correctly stated the standard applied to the submitted evidence of actual innocence: "The evidence in support of the claim must be: (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it probably would change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 331 [(2009)]."

¶ 70    The standard applied by the circuit court is reflected in its written order, entered after a full hearing. In its written order, the trial court specifically found that the "new evidence" from Thomas " 'utterly lacked credibility,' " " 'suffered from a number of issues' " (*supra* ¶ 46), and was damaged " 'from the overall unbelievable narrative' " of Thomas's and defendant's interactions in prison (*supra* ¶ 47). Critically, the circuit court expressly found that " '[t]here is no basis to find that the outcome at trial could have possibl[y] differed based on the incredible account Thomas gave this Court. Accordingly, petitioner's actual innocence claim falls short.' " *Supra* ¶ 48. This is the standard applied by the circuit court: there was no possibility the new evidence would have changed the outcome at a new trial. See *Reed*, 2020 IL 124940, ¶ 43 (" 'supporting evidence [must] be new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial' " (quoting *Washington*, 171 Ill. 2d at 489)). "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97.

¶ 71    Postconviction relief must be based on evidence that is found to be reliable after a third-stage hearing. *People v. Sanders*, 2016 IL 118123, ¶ 42. Evidence that is not credible would not place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt. See *Robinson*, 2020 IL 123849, ¶ 56 ("the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt"). The conclusive character of the new evidence is the most important element of an actual innocence claim. *Washington*, 171 Ill. 2d at 489. Thus, the "actual innocence" standard is "extraordinarily difficult to meet." *Coleman*, 2013 IL 113307, ¶ 94.

¶ 72    In *Reed*, 2020 IL 124940, ¶ 49, our supreme court established that an actual innocence claim by a petitioner who pleaded guilty requires "new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal." In doing so, the supreme court reversed the appellate decision that found a defendant that pleaded guilty was barred from raising an actual innocence claim in a successive postconviction petition. However, the supreme court reviewed the trial court's dismissal of the petition after a third-

- 13 -

stage hearing and found it could find nothing in the record to undermine the adverse credibility finding based, in part, on the evidence that the new witness

> "came forward only after being imprisoned and discussing the case with defendant. The trial court is in the best position to make this determination, as it had the benefit of observing [the new witness's] demeanor during examination and assessing his testimony against the other evidence. [*People v. Morgan*, 212 Ill. 2d 148, 162 (2004).] There is nothing in the record to undermine its judgment in this case." *Id.* ¶ 54.

¶ 73   Similar to *Reed*, a review of the trial court's decision in this case shows beyond question that it used the correct legal standard and that its decision to deny successive postconviction relief was based on its determination that the new evidence provided by Thomas was not credible. The trial court's written order states:

> "At the outset, Thomas' credibility is severely diminished due to his convictions and incarceration. In case 02CR1093901, Thomas was sentenced to serve a term of 100 years imprisonment for first degree murder, 720 ILCS 5/9-1(a)(1), and 20 years' imprisonment for home invasion with a firearm, 720 ILCS 5/12-11(a)(3). In case 04CR04516101, Thomas was sentenced to serve consecutive terms of 20 years' imprisonment for two counts of aggravated criminal sexual assault, 720 ILCS 5/12/14(a)(3), (8). The severity of Thomas' crimes along with the length of his aggregate sentence, which is effectively life imprisonment, undermines the integrity of his testimony. Aside from the inherent untrustworthiness of his statement based on his background, Thomas's credibility also suffered from a number of issues that arose during the course of the evidentiary hearing.
>
> First, Thomas has not convincingly established that he was able to make an accurate and reliable identification of the vehicle's occupants. According to his testimony, Thomas was walking on the opposite side of the street from the vehicle as the vehicle traveled in the same direction. As a result, Thomas would only have observed the vehicle on the driver's side, after the vehicle had passed him. Based on his position in relation to the vehicle, it is unclear how he would have been able to observe the faces of any of the vehicle's occupants. It therefore remains unlikely that he could either identify the occupants or dismiss petitioner's presence.
>
> Next, Thomas' credibility is damaged by his purported actions following the shooting. While Thomas attested that he was friends with both petitioner and the victim, he never provided information to the police, despite a clear opportunity to do so and no clear barriers preventing him. Even assuming, arguendo, that Thomas did not speak to police because he had a legitimate concern for the safety of his family, his rationale is clearly insufficient after police informed him that at least one of the alleged shooters, Lawrence Gooden, was dead. There does not appear to be a legitimate basis to avoid informing police about Gooden's involvement in Miller's murder at this point, as Gooden was incapable of retaliation.
>
> Finally, Thomas' credibility is further damaged from the overall unbelievable narrative that he and petitioner have conveyed to this Court. First, they indicate that Thomas observed the shooting and had exculpatory evidence pertinent to petitioner's case but after the shooting Thomas decided to withhold his information not only from the police, but also from everyone he knew. Years later, Thomas happened to find himself in the same housing unit of the same correctional facility as petitioner, where

- 14 -

they met and had regular contact. Despite this regular contact, Thomas and petitioner claim they never once discussed petitioner's case over the course of three or four years. They were unable to provide any cause for their reticence over that information. After three or four years, petitioner, conveniently, happened to find Thomas' name in a police report from the unrelated murder of Lawrence Gooden that counsel had attached to an earlier post-trial motion. For no particular reason, petitioner decided to tell defense counsel to interview Thomas. Petitioner and his counsel then learn that Thomas just so happened to be the sole witness to the murder that could exonerate petitioner. Despite making this groundbreaking discovery, petitioner and Thomas maintain that they persisted in their mutual silence about petitioner's case, leading up to the evidentiary hearing. This account contains too many convenient coincidences and what appears to be entirely aberrant behavior by Thomas and petitioner to find Thomas' testimony credible.

Thomas' testimony, when weighed against the evidence presented at trial, falls short of providing petitioner of the complete vindication and total exoneration that are the hallmarks of an actual innocence claim. There is no basis to find that the outcome at trial could have possible [*sic*] differed based on the incredible account Thomas gave this Court. Accordingly, petitioner's actual innocence claim falls short."

¶ 74 The trial court's summary of the hearing evidence is fully supported by the hearing record. Thomas's extensive criminal background, his questionable ability to make an accurate identification of the offenders, his postincident interactions, and his convenient surfacing in prison many years after the murder as a witness that could establish petitioner's actual innocence demonstrate that his testimony would probably not change the result of a retrial. There is no basis to conclude the order denying relief is manifestly erroneous. As stated, in a third-stage evidentiary hearing, the circuit court serves as the fact finder, and therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. *People v. English*, 2013 IL 112890, ¶ 23. Given the procedural posture of this case, the circuit court was charged with determining whether the new evidence demonstrated that the petitioner was entitled to relief. New evidence that is not credible cannot justify third-stage relief. Based on the complete record, I would affirm the decision of the circuit court to deny successive postconviction relief. The circuit court's determination was not manifestly erroneous.

¶ 75 Finally, I also dissent from the decision to remand to a different judge. Nothing contained in this record remotely warrants the inference that on remand the experienced and respected trial judge is incapable of considering this case in full compliance with all applicable laws and decisions of this court and our supreme court.

¶ 76 I respectfully dissent.