2025 IL App (1st) 231485

No. 1-23-1485

Opinion filed December 31, 2025

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.12 CR 12487 |
| KEON TOLLIVER, | ) ) | |
| Defendant-Appellant. | ) ) ) | The Honorable Charles P. Burns, Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Tailor concurred in the judgment and
opinion.

**OPINION**

¶ 1        Defendant Keon Tolliver was convicted after a jury trial of first degree murder and

sentenced to 27 years for first degree murder, with an additional 25-year enhancement for

personally discharging a firearm causing death. The resulting aggregate sentence was 52 years

with the Illinois Department of Corrections (IDOC). On direct appeal, defendant, who was 17

years old at the time of the offense, raised several claims, including (1) that he was entitled to

a new sentencing hearing at which the trial court would be required to consider various

characteristics of his youth and rehabilitative potential and at which the trial court could decline to impose the mandatory firearm enhancement and (2) that he had received an impermissible *de facto* life sentence that violated the eighth amendment of the United States Constitution and the proportionate penalties clause of our state constitution. On June 4, 2018, the appellate court affirmed his conviction and sentence.

¶ 2 However, on March 25, 2020, the Illinois Supreme Court, in the exercise of its supervisory authority, directed the appellate court to vacate its judgment and to consider the effect of the Illinois Supreme Court's opinions in *People v. Buffer*, 2019 IL 122327, and *People v. Holman*, 2017 IL 120655, on the issue of whether defendant's sentence constituted a *de facto* life sentence in violation of the eighth amendment and *Miller v. Alabama*, 567 U.S. 460 (2012), and to determine if a different result was warranted.

¶ 3 On remand, pursuant to an agreement among the parties, this court vacated defendant's 52-year sentence and ordered that he be resentenced. On remand, defendant elected to be resentenced under the current statutory scheme, which permits offenders under the age of 21 years to petition for release on parole after serving 20 years in prison. At the resentencing hearing on July 25, 2023, defendant received a total aggregate sentence of 47 years, which he now appeals.

¶ 4 In this appeal, defendant argues (1) that his now 47-year sentence violates the United States and Illinois constitutions because it constitutes a *de facto* life sentence imposed on a juvenile offender without any meaningful chance for release, (2) that his sentence violates both constitutions because the trial court allegedly refused to consider defendant's youth and attendant characteristics in sentencing him or, in the alternative, (3) that this court should vacate his sentence and either reduce it or remand for a new sentencing hearing because the

trial court allegedly abused its discretion in imposing an excessive sentence. For the following reasons, we affirm.

¶ 5                                    I BACKGROUND

¶ 6         Defendant was convicted of the first degree murder of 17-year old Roemello Golden on the evening of June 13, 2012. At trial, eyewitnesses Deshaundria Robinson, Allen Esther, and Trishaun Coleman testified that they were chatting with the victim outside of a friend's house on the night of June 13, 2012. Defendant and another man were standing on a nearby corner and were both wearing hoodies with the hoods pulled over their heads. The two men approached, and one said, "What's up?," and shots were fired seconds later. Coleman and Esther testified that they saw defendant shoot the victim. Robinson testified that the shots were coming from defendant's direction. The day after the shooting, Robinson, Esther, and Coleman all separately viewed a lineup and identified defendant as the shooter. The victim died from 10 gunshot wounds to his body. Officer Louis Garcia testified that, while on a routine patrol shortly before the shooting, he had stopped defendant, who was a Latin King in an area that the officer knew to be "Black P. Stone territory." Defendant was wearing a hoodie and was then five blocks north of the shooting. After listening to the evidence, closing arguments, and jury instructions, the jury found defendant guilty of first degree murder and found that he had personally discharged a firearm during the murder. As noted above, defendant's original sentence of 52 years was vacated, and he was subsequently resentenced to 47 years.

¶ 7         The resentencing hearing, on July 25, 2023, began with defendant's election to be sentenced under the current statutory scheme. 730 ILCS 5/5-4.5-105 (West 2022).[1] After

---

[1]Section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5-4.5-105 (West 2022)), has been amended twice since defendant's resentencing. Pub. Act 103-191 (eff. Jan. 1, 2024); Pub. Act

defendant made this election, the trial court observed that "the new sentencing scheme gives an individual under the age of 21 the opportunity to ask for a [p]arole [h]earing and to be paroled after serving 20 years of a sentence." See 730 ILCS 5/5-4.5-115 (West 2022).[2]

¶ 8        The trial court acknowledged that it had received a 21-page mitigation report from the defense, a sentencing memo from the State, and a supplemental presentence investigation report (PSI), file-stamped January 13, 2023. In aggravation, the State did not present live testimony, but did introduce defendant's IDOC disciplinary card, which the parties stipulated was, in fact, defendant's IDOC disciplinary card. In response to a question by the court, the State confirmed that the State was not submitting any of the individual incident reports from IDOC, but just the summary contained in the card. The State also provided the original victim impact statement, dated January 7, 2015. Thus, the State's documents in aggravation consisted of its sentencing memo, defendant's IDOC disciplinary card, and the original victim impact statement.

¶ 9        In aggravation, the State argued that the victim sustained 10 gunshot wounds, including a shot to the face, and that the 52-year sentence was appropriate, particularly in light of defendant's new eligibility for parole. The trial court then asked the defense if it believed that defendant's prior 52-year sentence was constitutionally void in light of defendant's new eligibility for parole after 20 years. In response, the defense argued that anything above 40 years was a *de facto* life sentence and that the mitigation, which it had assembled, showed that 52 years was inappropriate. Further, defense counsel noted that, at the original sentencing

---

103-605 (eff. July 1, 2024). However, the parties do not suggest that these amendments affect the arguments on appeal.

[2]Section 5-4.5-115, which governs the parole review of juvenile offenders, has been amended three times since defendant's resentencing. Pub. Act 102-1128 (eff. Jan. 1, 2024); Pub. Act 104-22 (eff. June 20, 2025); Pub. Act 104-233 (eff. Jan. 1, 2026). However, the parties do not claim that these amendments affect the arguments on appeal.

hearing in 2015, the trial court had stated that it had no choice but to impose a firearm enhancement, but now the court had a choice. The defense asked for a total sentence between 20 and 27 years, with no imposition of the firearm enhancement.

¶ 10 In mitigation, defense counsel argued that defendant's first 17 years were characterized by trauma and chaos. For example, in the PSI, defendant described using drugs and alcohol with his mother when he was 10-years old and asserted that this was the only time she paid attention. Counsel observed that defendant's mother, sister, and brother were all present in court and that the mother was a different person now. Counsel argued that, in the PSI, defendant described leaving home numerous times but returning because he felt responsible for his 10 siblings. Counsel noted that this information in the PSI was corroborated by an interview with one of defendant's sisters.

¶ 11 Counsel argued that defendant's mother was a drug-addicted 17 year old when she gave birth to defendant, and that her mother was also drug-addicted. Defendant was the oldest of 11 children. No father was listed on defendant's birth certificate. Later defendant learned who his biological father was, and defendant recently had phone contact with him for the first time. The mitigation report documented that, between 2003 and 2006, when defendant was 9 through 12 years old, the family moved 12 times. Because they moved so frequently, defendant felt that he could never finish out a school year. Defendant witnessed his mother being victimized by various violent men, and defendant experienced extreme corporal punishment at the hands of his mother and her male friends.

¶ 12 Counsel argued that defendant's mother was a prostitute and that defendant experienced sexual abuse. Sometimes, the family stayed in parks or abandoned buildings. One time, after locating his mother in an abandoned building, defendant arranged for their family

to live in a friend's basement. Starting at the age of 12 or 13, defendant tried to earn money, but, if that failed, he stole food.

¶ 13          Counsel argued that, starting at age 13, defendant began living at the home of Gregory Banks, who was a member of the Latin Kings. Defendant started selling drugs and hanging with Banks's Latin King friends. At age 14, defendant had two juvenile cases, which were both for unlawful use of a weapon, with a disposition finding of delinquency. In one case, defendant received probation; in the other, he was sentenced to the Juvenile Department of Corrections. When defendant was paroled at age 15, he lived briefly with his Latin King friend until that friend was incarcerated, and defendant was once again homeless. Defendant went to live with his uncle in Iowa, and then lived with a girlfriend in Iowa. However, when defendant was pulled over, the Illinois juvenile warrant popped up, and defendant was sent back to Illinois. In November 2011, defendant was released again on parole. Counsel argued that defendant had tried three times, overall, to commit suicide.

¶ 14          Counsel noted that defendant had received six tickets while in IDOC. Counsel argued that there was an earlier 3-year period without any tickets and another 2-year period without any tickets. Counsel observed that there was a period of time when defendant was mischaracterized as a sex offender, which caused him to get into situations with other inmates. The trial court interrupted and said that, from its review of the tickets, "it appears that his behavior is becoming more violent." The court noted a 2016 ticket for insolence and disobeying a direct order, which the court stated was for not obeying a correctional officer. The court noted tickets, in 2017 for assault and, in 2020, for unauthorized or gang activity, for which defendant received 45 days in segregation and six months of visit restriction. The court observed that, right before this case was remanded back, defendant received another 45 days

in segregation for gang or unauthorized activity. The court stated: "I'm not concerned about the misuse of property in September, but we have another one as recently as March of 2021 where he's found guilty of fighting." The court noted that all these incidents were incidents where defendant was found guilty. The court stated that it could understand if these tickets were early in defendant's sentence, when defendant was still maturing, but the court found that defendant's behavior was becoming more violent.

¶ 15    Counsel argued that a fellow inmate stated in an interview, during the preparation of the mitigation report, that defendant did not belong anywhere, in that defendant did not belong in the Latin Kings because he was not Hispanic, and defendant did not belong in a black gang. The inmate said that not belonging is the most dangerous position to be in when in prison.

¶ 16    Counsel noted that, while in prison, defendant completed "adult basic education." Counsel claimed that defendant wanted more education but that the educational programs were wait-listed by a prisoner's out-date, and defendant had 52 years in jail. Counsel explained that, once a prisoner tests out at an eighth grade level, further education is wait-listed. However, defendant had kept himself busy by working, which was documented in the mitigation packet. Defendant had worked as a janitor and in the general labor pool.

¶ 17    Counsel read into the record letters from two of defendant's siblings. His brother's letter confirmed that defendant had watched over them, teaching them how to tie their shoes and do their homework, and that their mother was on drugs, and with men, and would leave for periods of time. His sister's letter spoke of the struggle of going from shelter to shelter for a few years and that defendant taught them how to pray at a young age. However, her letter also stated that their mother always made sure that they were safe and fed, no matter what, and that their mother did what she had to do or asked someone else. His sister said that when her

7

mother was able to start a job, she worked from sunup to sundown. The court pointed out that the sister's letter "paints a different picture than [the] mitigation report." To which, counsel responded that she was a younger sibling.

¶ 18        Looking at the mitigation factors, counsel argued that defendant was impetuous and immature at the time of the offense, that he was unable to consider risk and the consequences of his behavior, that his home environment was horrible, that he experienced abuse and childhood trauma, and that defendant had the potential for rehabilitation.

¶ 19        The trial court noted that, no matter what sentence the court gave, defendant was still eligible for parole in 20 years, and defense counsel agreed with that. Defense counsel noted that the court had discretion to not include a firearm enhancement, and the court agreed. As a result, counsel argued that the court had "the discretion to sentence [defendant] to what we're asking for, which I think is sufficient, to 20 to 27 years, without the firearm enhancement." Counsel also argued that the trial court did not have the discretion to impose more than 40 years.

¶ 20        Defendant addressed the court, stating that he had had a "rough childhood"; that, because of the length of his 52-year sentence, he could not qualify for prison programs, and, thus, when he later appears in front of the parole board in 20 years, he will not have anything to show them; and that if the court again imposes a lengthy sentence, defendant still will not be able to demonstrate rehabilitation to the parole board because he will continue to be ineligible for educational programs. Defendant also asserted that he was in the worst prison in Illinois. Defendant ended by apologizing for the wrong that he had done in the past.

¶ 21        The trial court noted that, although defendant was definitely entitled to juvenile protections, defendant was just under 18 years at the time of the offense—namely, 17 years

old and eleven months. The court ruled that "a sentence that imposes an opportunity for a defendant to be released during his lifetime is, in fact, a constitutional sentence." Addressing defendant's argument that he cannot demonstrate rehabilitation without access to programs, the court said, "the first thing [it[ would say" was "shame on you State of Illinois" and "shame on your [IDOC]" for failing to provide programs. The court noted that it did not "know what the parole board is going to do with this new statute." However, the court reiterated that "any sentence that gives an individual an opportunity to be paroled within a *de facto* life situation, that being 40 years, is, in fact a constitutional sentence."

¶ 22    The court stated that it was first going to address defendant's criminal background and the facts of the case. The court noted that defendant had twice been convicted of gun offenses as a juvenile, for which he had served probation and correctional time. After two separate juvenile adjudications for gun offenses, he committed this gun-related offense. Turning to the facts of the case, the court found that this murder was not done "in the heat of passion," but rather was "a cold-blooded murder" of a victim, who was standing on the street and then was shot multiple times.

¶ 23    Looking at defendant's personal background, the court found "there is no doubt whatsoever that no child should have to go through the situation growing up that [defendant] did." The court found, based on what the court described as a "very extensive mitigation report," that defendant had been subjected to physical abuse, that he moved from place to place, that his siblings loved him very much, and that defendant basically grew up on the street.

¶ 24    Discussing the factors of immaturity and impetuosity, the court found "the mere fact that somebody commits a crime such as that does not make them immature." The court said that it did not "see the immaturity on this where he was so impulsive and could not understand

9

consequences." The court found that walking up to a person on the street, pulling out a gun, and shooting that individual 10 times was not the mark of an immature person who did not understand consequences.

¶ 25    The court found that the factor of "family and home environment" was "very, very mitigating." However, the court found "no mitigating factor here with regard to degree of participation or role of peer or familial pressure." In support of this conclusion, the court observed that defendant was not a getaway driver or a lookout and that there was no evidence that defendant was forced to do this as part of a gang initiation or by an older brother or parent, but rather that defendant was the "primary" offender.

¶ 26    The court found that "[i]nability to deal with police officers or attorneys" was not a factor here. The court noted that it "sat on this case before" and that it "saw the professional competence of his first attorney." The court also observed that, when the case was remanded for resentencing, the allegation of ineffective assistance of counsel was withdrawn.

¶ 27    The court then read into the record the list of factors in the Illinois statute and added relevant comments. 730 ILCS 5/5-4.5-105(a) (West 2022). The first factor was "the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any." 730 ILCS 5/5-4.5-105(a) (West 2022). The court had covered most of that, but added that there was no evidence that defendant had any cognitive or developmental limitation such "that he could not understand risks or consequences." The court noted that defendant "apparently did okay in school when he did go to school."

¶ 28    The second and third factors were "whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences" and "the person's

family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma." 730 ILCS 5/5-4.5-105(a)(2), (3) (West 2022). The court believed that it had "basically" covered that.

¶ 29 The fourth factor was "the person's potential for rehabilitation or evidence of rehabilitation, or both." 730 ILCS 5/5-4.5-105(a)(4) (West 2022). The court stated that "obviously that makes me look at the past, makes me look at the present, and frankly I have to look into a crystal ball to see what's going to happen in the future."

¶ 30 The fifth factor was the circumstances of the offense (730 ILCS 5/5-4.5-105(a)(5) (West 2022)), which the court found it had already "talked about." The sixth factor was "the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense." 730 ILCS 5/5-4.5-105(a)(6) (West 2022). The court stated: "Again, circumstantial evidence indicates that this is something that did not just happen at the spur of the moment."

¶ 31 The seventh factor was "whether the person was able to meaningfully participate in his or her defense." 730 ILCS 5/5-4.5-105(a)(7) (West 2022). The court found: "Again, there's nothing that indicates he has not." The eighth factor was "the person's prior juvenile or criminal history." 730 ILCS 5/5-4.5-105(a)(8) (West 2022). The court found: "Once again I considered and talked about [that]." The court did not mention the next three factors: the person's involvement in the child welfare system, the person's involvement in the community, and a mental health evaluation if one was done. 730 ILCS 5/5-4.5-105(a)(9), (10), (11) (West 2024). However, defendant did not object at the resentencing or at the subsequent hearing on the motion to reconsider.

¶ 32    The final and twelfth factor was "any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a)(12) (West 2024). The court said, "I don't think he made a statement of remorse." However, the court found, "I think he's is [*sic*] sorry for what happened but again, pursuant to the statute and pursuant to my own sentencing philosophy I don't expect a statement of remorse."

¶ 33    The trial court then discussed the sentencing enhancement, which it again observed was discretionary. The court found that the intent of the legislature was to deter gun crimes, but "[w]hether it deters or not," the court conceded, "I don't know." The court observed "this is the third time this defendant has been caught with a gun or a gun-related offense, third time. Albeit two of them were juveniles, this is a third circumstance." In addition, "the gun that was used was fired several times." The court concluded that, although the enhancement was discretionary, the enhancemewnt was proper in these circumstances and supported by the facts and defendant's background.

¶ 34    The court observed that defendant was eligible for parole after 20 years, where "[t]his is not a murder of [a] particular [type of] victim or multiple bodies or supported by brutal and heinous behavior indicative of wanton cruelty." The court noted that it originally gave defendant 27 years, plus a 25-year enhancement. However, it had now heard "extensive mitigation in this matter" and so was 'going to lower that 27 years to 22 years" with a 25-year enhancement. The resulting aggregate sentence was, thus, 47 years. The court said: "I will note for whoever is reviewing this record that this [22-year sentence] is barely over the minimum." The court stated: "It is 2 years over the minimum despite the heinous, cold-blooded nature of

12

this particular homicide and despite the fact that this is the third time he was caught with a weapon or involved with a crime of a weapon."

¶ 35        Defendant filed a motion to reconsider, which was heard on August 10, 2023, and which asked the court to reconsider the 25-year firearm enhancement. Counsel argued that the sentence was still excessive, that the court wrongly utilized defendant's two juvenile offenses, and that the court misapprehended that they did not involve anything other than possession. The court noted that, in this case, the firearm was used to shoot an individual in the face, at close range, with multiple shots. Counsel replied that murder is always going to be violent, and the court responded that there are levels and that "it's a little bit different" when you fire 10 separate times rather than "firing one time over the shoulder." Counsel argued that the trial court had "overutilized" the facts of the original offense and defendant's juvenile record. Counsel noted that the court had said that this was not an isolated shooting, when the prior offenses were not shooting but possession. The court said, "just for the record, if I did misspoke (sic), I misspoke."[3] The court clarified that what it meant to say was that this was a planned and premeditated shooting.

¶ 36        Counsel argued that the two prior juvenile matters caused the court to impose the enhancement and that defendant had a tremendous amount of mitigation, which was corroborated by his other family members. The court interjected that one family member said that she had a fairly decent upbringing and that the court had noted this fact at the prior sentencing and that it contradicted defendant's argument. Counsel responded, as counsel had before, that this sister was a younger sibling. Counsel concluded by asking the court to remove the sentencing enhancement and to sentence defendant to no more than 40 years.

---

[3]The notation "Isic" is in the original transcript.

¶ 37        The trial court stated that it believed that its prior ruling was very clear as to what it had considered. The court noted that it had considered all the factors in aggravation and mitigation and had exercised its discretion in crafting a sentence. The court noted that, under counsel's argument, every murder with a discretionary firearm enhancement would be unconstitutional because it would be 25 years, plus a minimum of 20 years, for a sentence of over 40 years. The court explained that it was well aware that the enhancement was discretionary but that it "chose to apply it in this particular situation because of the facts of the case." At the hearing on August 10, 2023, the trial court denied defendant's motion to reconsider, and a timely notice of appeal was filed the same day.

¶ 38        In response to the State's motion on June 11, 2025, to cite additional authority—namely, the supreme court's opinion in *People v. Spencer*, 2025 IL 130015—this court permitted the parties to rebrief the issues in light of *Spencer*. This appeal followed.

¶ 39                                II. ANALYSIS

¶ 40        In defendant's post-*Spencer* briefs, defendant argues (1) that his 47-year aggregate sentence violates the United States and Illinois constitutions because it constitutes a *de facto* life sentence imposed on a juvenile offender without any meaningful chance for release; (2) that the 47-year aggregate sentence is unconstitutional because the trial court allegedly refused to consider defendant's youth and attendant circumstances in sentencing him; and (3) that this court should vacate defendant's sentence and either reduce his sentence or remand for a new sentencing hearings.

¶ 41        "An as-applied constitutional challenge is a legal question that we review *de novo*." *Spencer*, 2025 IL 130015, ¶ 25. In *Spencer*, our supreme court found that, for a defendant who meets the criteria to be eligible for parole review after serving 20 years of his sentence, "the

14

applicable sentencing scheme allows [him] a meaningful opportunity to obtain release before he spends 40 years in prison." *Spencer*, 2025 IL 130015, ¶ 40. "Accordingly," such a defendant is "not sentenced to a *de facto* life sentence." *Spencer*, 2025 IL 130015, ¶ 40. As a result, pursuant to *Spencer*, defendant was not serving a *de facto* life sentence.

¶ 42     Tying to distinguish *Spencer*, defendant asserts that *Spencer* involved a young adult who was over 18 years old and, thus, the case does not apply to a juvenile such as himself. However, defendant fails to explain why parole review would be a meaningful opportunity for release for a young adult, but not for a juvenile, such as himself. Thus, we do not find this argument persuasive. Defendant was sentenced under provisions that allow him to apply for parole after serving 20 years in prison. After he serves 20 years, which is not a *de facto life* sentence (*People v. Buffer*, 2019 IL 122327, ¶ 40), he will be eligible for release after review.

¶ 43     Defendant also argues that *Miller* and its progeny, decided under the eighth amendment, apply to him, whereas they did not apply to the *Spencer* defendant. However, our supreme court has found that *Miller* " 'did not prohibit life sentences for juveniles but, instead, held that the eighth amendment required sentencing courts to have discretion in sentencing juveniles after considering[4] the juvenile's youth and the attendant characteristics of youth.' " *Spencer*, 2025 IL 130015, ¶ 30 (quoting *People v. Clark*, 2023 IL 127273, ¶ 54). In the case at bar, there is no dispute that the trial court had such discretion at defendant's resentencing and stated that it was, in fact, exercising the discretion it had been given.

---

[4]Whether the trial court expressly refused to consider defendant's youth, as defendant claims, is a question we will discuss further below. *Infra* ¶ 48.

¶ 44    Thus, pursuant to *Spencer*, we find that defendant's sentence was not a *de facto* life sentence without possibility of parole, and we do not find his attempts to distinguish this case from *Spencer* to be persuasive.

¶ 45    The State argues that the fact that defendant is *not* serving a *de facto* life sentence forecloses his ability to bring a constitutional challenge. However, the *Spencer* court held: "Notwithstanding the fact that [the defendant] is not serving a *de facto* life sentence, he is not foreclosed from bringing an as-applied challenge to his sentence pursuant to the Illinois proportionate penalties clause." *Spencer*, 2025 IL 130015, ¶ 42. "A defendant may challenge a sentence of any length." *Spencer*, 2025 IL 130015, ¶ 43. "Further, the Illinois Constitution does not limit a proportionate penalties challenge to just juveniles or individuals with life sentences." *Spencer*, 2025 IL 130015, ¶ 43. Whether the defendant is a juvenile or a young adult, the challenge may be "based on the evolving science regarding juvenile maturity and brain development." *Spencer*, 2025 IL 130015, ¶ 43. Thus, in the case at bar, defendant may still bring an as-applied challenge to his sentence.

¶ 46    Our supreme court found that the proper venue for the *Spencer* defendant's as-applied challenge was in a postconviction proceeding because that case lacked a "sufficiently developed evidentiary record." *Spencer*, 2025 IL 130015, ¶ 45. Since as-applied challenges are, by definition, reliant on the application of the law to the specific facts of the case, a sufficiently developed record is of paramount importance. *Spencer*, 2025 IL 130015, ¶ 44. However, in the case at bar, the matter was specifically remanded to allow for a sufficiently developed record and, in fact, included an extensive mitigation packet.[5] Thus, unlike the *Spencer* case, the instant case is fully developed for our review.

---

[5]Defendant agrees, arguing in his appellate brief:

¶ 47    Defendant argues that the trial court expressly refused to consider his youth and its attendance characteristics and cites in support *People v. Wilson*, 2023 IL 127666, ¶ 38. In *Wilson*, our supreme court found that a discretionary sentencing scheme, in itself, satisfies *Miller*'s requirement that sentencing courts account for youth and its attendant circumstances,

"*unless* a sentencing court 'expressly refuses as a matter of law to consider the defendant's youth (as opposed to, for example, deeming the defendant's youth to be outweighed by other factors or deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case).' " (Emphasis added.) *Wilson*, 2023 IL 127666, ¶ 38 (quoting *Jones v. Mississippi*, 593 U.S. 98, 115 n.7 (2021)).

¶ 48    Defendant argues that the trial court expressly refused to consider his youth when the court stated that it did not "see the immaturity on this where he was so impulsive and could not understand consequences." However, the trial court explained what it meant, stating that the murder was planned and premeditated, rather than impulsive or passionate, and that defendant was "the primary" rather than an accessory or a lookout. See *Wilson*, 2023 IL 127666, ¶ 38 (" 'deeming the defendant's youth to be outweighed by other factors' " and " 'deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case' " (quoting *Jones*, 593 U.S. at 115 n.7). In the case at bar, defendant waited for his victim on a street corner, dressed in a hoodie with the hood pulled down, approached

---

"[W]here the matter was remanded specifically for the court to fashion a *Miller*-compliant sentence, where the constitutional arguments were raised and developed below, and a detailed mitigation analysis was conducted with the purpose of supporting such arguments, the record is sufficiently developed such that this Court may address [defendant's] constitutional challenges, instead of requiring that duplicated arguments be raised in post-conviction proceedings."

In a footnote in its brief, the State noted that it did "not disagree with this position."

his victim on foot, pulled out a gun, and shot the victim multiple times. As the record indicates (*supra* ¶¶ 7-37), the trial court considered and discussed the statute's list of relevant factors, but it did not weigh them as defendant hoped. While the court found the factor of family and home environment was "very, very mitigating," it found that the circumstances of the offense, as well as other factors, warranted the imposition of the firearm enhancement. Defendant brought a motion to reconsider, which was fully argued, and the trial court once again articulated its reasons. We are loathe to substitute our judgment for that of the trial court in deciding what point to select within a statutorily authorized sentencing range or whether to impose a statutorily authorized enhancement, where the trial court weighed and considered the statute's list of factors, stated on the record how it weighed and considered them, and repeatedly indicated its awareness of the discretion that it had the ability to exercise.

¶ 49     We note that the trial court did not mention three factors: the person's involvement in the child welfare system, the person's involvement in the community, and a mental health evaluation if one was done. 730 ILCS 5/5-4.5-105(a)(9), (10), (11) (West 2024). On appeal, defendant does not argue the first two but does raise the issue of his mental health and cites in support his mitigation packet. The "overview" portion of his mitigation packet asserted that defendant has "been diagnosed with schizoaffective disorder (a diagnosis characterized [by] disorganized though processes and unstable mood plus positive symptoms, such as auditory or visual hallucinations, but does not rise to the severity of schizophrenia or schizophreniform[)]." Although the overview portion of the mitigation report asserted a diagnosis, no mental health evaluation was attached to the packet. The packet did not maintain that defendant was currently under medication or treatment, but rather contended that defendant "copes by practicing meditation, prayer, reading and listening to music." In addition, counsel did not argue this

factor at either the resentencing or the hearing on the motion to reconsider and did not object to the court's omission of this factor at either hearing. Thus, this issue was waived for our consideration.

¶ 50     We agree with the trial court when it said "shame on you" to the State of Illinois and IDOC for not providing sufficient educational programs. However, if a criterion is impossible to fulfill, its absence cannot possibly be held against a person. While defendant argues that, at his 20-year parole review hearing, he will have nothing to show but tickets, that is not true. According to the defense's arguments below, defendant has a demonstrable prison work history, and he is more than half-way toward the time of his parole review.

¶ 51                                    III. CONCLUSION

¶ 52     Pursuant to *Spencer*, we find that defendant is not serving a *de facto* life sentence without possibility of parole. We also find that the transcripts of his resentencing and the hearing of his motion to reconsider establish that the trial court was aware of the discretion that it could exercise and that it considered and weighed the statute's list of relevant factors in fashioning a statutorily authorized sentence. For these reasons, we decline defendant's invitation to fashion our own sentence pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) (permitting a reviewing court to "reduce the punishment imposed by the trial court") or to remand again for another hearing pursuant to Illinois Supreme Court Rule 615(b)(2) (eff. Jan. 1, 1967) (permitting a reviewing court to "set aside *** any or all of the proceedings"). As a result, we must affirm.

¶ 53     Affirmed.

***People v. Tolliver*, 2025 IL App (1st) 231485**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-12487; the Hon. Charles P. Burns, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Erin K. Slattery, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |