**2023 IL 127666**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 127666)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
MICHAEL WILSON, Appellee.

*Opinion filed May 18, 2023.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, and Holder White concurred in the judgment and opinion.

Justices Rochford and O'Brien took no part in the decision.

## OPINION

¶ 1 Petitioner, Michael Wilson, filed a motion in the circuit court of Kankakee County seeking leave to file a successive postconviction petition challenging his sentence for murder. Wilson, who was a juvenile at the time of sentencing, alleged that the sentencing court had violated the eighth amendment by imposing a *de facto*

life sentence without first making a finding of permanent incorrigibility or specifically addressing the attendant characteristics of youth discussed in *Miller v. Alabama*, 567 U.S. 460 (2012).

¶ 2 The circuit court denied Wilson leave to file his successive petition, finding he had failed to establish either cause or prejudice under section 122-1(f) of the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1(f) (West 2016). On appeal, the appellate court reversed that determination, vacated Wilson's sentence, and remanded the case for resentencing. 2021 IL App (3d) 200181-U. For the following reasons, we reverse the judgment of the appellate court and remand the cause to that court for further proceedings.

¶ 3 BACKGROUND

¶ 4 On the evening of December 26, 2008, Ryan Graefnitz and two friends, Joseph Benegas and Walter Waschke, drove to Kankakee in search of cocaine. While stopping to get gas, Graefnitz encountered Wilson and Byron Moore, who told Graefnitz they knew where to buy drugs. The group then drove to an apartment building in Kankakee.

¶ 5 When they arrived at the building, Wilson, Moore, and Graefnitz got out of the car and went into the building's vestibule. Witnesses inside the building heard someone announce that a robbery was taking place and then heard two or three gunshots. Benegas and Waschke, who had been waiting in the car, also heard the gunshots and then saw Graefnitz exit the building and collapse on the ground. Graefnitz had been shot in the back and died from his wounds. Benegas and Waschke also both saw Wilson and Moore run from the building.

¶ 6 The State subsequently filed a petition alleging that Wilson, who was 14 years old at the time of the murder, was a delinquent minor. The State then moved to transfer the case to criminal court.

¶ 7 Following a hearing, the circuit court reviewed the relevant statutory factors governing the motion to transfer, including the seriousness of the offense and the public's interest in being protected from crime, as well as the personal history of Wilson and his potential for rehabilitation. The court granted the transfer motion,

concluding that charging Wilson in the juvenile justice system " 'with the hope that this minor will somehow be transformed into a non-violent law abiding citizen ready for release in society at age 21' " would not serve " 'the public interest nor the interest of justice.' " *People v. Wilson*, 2015 IL App (3d) 130606-U, ¶ 13. Wilson was then charged by indictment with first degree murder and armed robbery.

¶ 8        Following a jury trial, Wilson was found guilty of first degree murder and attempted armed robbery. In response to a special interrogatory prepared by the State for sentence enhancement purposes, the jury found that Wilson did not personally discharge the weapon that caused Graefnitz's death.

¶ 9        The circuit court thereafter ordered the preparation of a presentence investigation report (PSI) for sentencing. The PSI, which consisted of more than 200 pages of individual reports and supporting documents, indicated that Wilson was born prematurely with cocaine and amphetamines in his system. He was placed into protective custody by the Department of Children and Family Services and was adopted when he was two years old. He was placed in a special education program because of his behavior problems and learning disabilities.

¶ 10       The PSI additionally showed that Wilson was diagnosed with attention deficit hyperactivity disorder (ADHD) in the third grade and later with oppositional defiant disorder, intermittent explosive disorder, and disruptive behavior disorder. By the time he was 13, Wilson was consuming alcohol regularly and smoking marijuana on a daily basis. School records dating from 2001 indicated that Wilson was emotionally disturbed and suffered from speech and language impairment, was noncompliant in the classroom, was aggressive to his peers and adults, and acted out and shouted without thinking. Wilson was suspended from school several times for his conduct.

¶ 11       The PSI contained a behavioral evaluation conducted in 2008 by the Riverside Resolve Center in connection with outpatient substance abuse treatment Wilson received because his behavior had become more severe over the years. Wilson's outpatient treatment was unsuccessful because he continued to use drugs. Later, he entered a residential program but was also unsuccessful because he left the facility without permission.

¶ 12    In 2007, Wilson was found guilty of criminal damage to property and trespass to real property. In the behavioral health screen for court supervision, Wilson was diagnosed with disruptive behavioral disorder with some oppositional defiant disorder. Wilson was sentenced to one year of court supervision, which was later revoked. Wilson was then placed in the River Valley Juvenile Detention Center.

¶ 13    The records from the River Valley Juvenile Detention Center, dated from 2009 to 2011, included medical progress notes, incident reports, and case notes. Most of these documents indicated Wilson had poor behavior and disregarded the rules. Wilson incurred several incident reports for fighting, disobeying staff, making deliberate or implied threats to staff, possession of contraband, damaging facility property, and refusing lockdown while in the detention center.

¶ 14    Also included in the PSI was a report from Dr. Paul Pasulka, who had evaluated Wilson in connection with the State's motion to transfer his case to criminal court. Dr. Pasulka diagnosed Wilson with mild retardation, ADHD, and depressive disorder with atypical features. Professor Monia Mahan had also evaluated Wilson in connection with the motion to transfer. Her report indicated Wilson was easily frustrated, not able to follow directions, and engaged in inappropriate behavior. He also had difficulty in all areas of functioning and only possessed a few adaptive behaviors to help him cope with day-to-day living.

¶ 15    At the sentencing hearing, the circuit court considered the PSI, the parties' evidence in aggravation and mitigation, a victim impact statement, and Wilson's statement in allocution. The court also heard argument from the State and from Wilson's attorney. The latter stressed to the court that it should look to what was "going on with defendant," including the fact that he was born with drugs in his system and suffered from substantial mental defects and that there was evidence in the PSI that it was reasonably likely Wilson could function in a structured setting. Following the parties' arguments, the court sentenced Wilson to 55 years' imprisonment for first degree murder (which included a 15-year firearm enhancement), to be served at 100%, and a consecutive term of 4 years' imprisonment for attempted armed robbery.

¶ 16    In explaining its reasons for the sentences, the court emphasized that the victim was shot in cold blood and left to die on the street. The court acknowledged Wilson's troubled history and developmental problems but stated that, in "page

after page after page after page [of the PSI], there is not one page that I can think of in this entire presentence investigation that doesn't talk about how bad you are." In addition, according to the court, the PSI showed that Wilson was "a very dangerous person," as he did not care who he hurt and was not going to abide by any rules.

¶ 17       On direct appeal, Wilson raised several arguments, including a contention that the circuit court had abused its discretion in imposing sentencing because it failed to consider mitigating factors, including Wilson's age, history of neglect, developmental delay, mental health history, and lack of a violent criminal history. *Wilson*, 2015 IL App (3d) 130606-U, ¶ 66. The appellate court rejected this argument, as well as others, and affirmed Wilson's convictions and sentence. *Id.* ¶ 69. With respect to Wilson's sentencing argument, the appellate court stated:

> "Here, the trial court considered the mitigating and aggravating factors and found that the aggravating factors far outweighed the mitigating ones because of defendant's conduct, including his behavior in juvenile detention, which showed a pattern of aggressiveness and violence. In this case, defendant's sentence of 55 years for murder, which was well within the statutory range, was not an abuse of discretion." *Id.*

¶ 18       On September 26, 2016, Wilson filed a *pro se* postconviction petition, which was summarily dismissed by the circuit court. On appeal, Wilson argued that he had presented the gist of a constitutional claim of judicial bias and the gist of a constitutional claim that his *de facto* life sentence violated the eighth amendment (U.S. Const., amend. VIII). *People v. Wilson*, 2019 IL App (3d) 160679-U, ¶ 20. The appellate court rejected these arguments and affirmed the summary dismissal. *Id.* ¶ 24. With respect to his claim of judicial bias, the appellate court held that the claim was forfeited because Wilson could have raised it on direct appeal but did not. *Id.* ¶ 25. In addition, the claim was without merit because the record disclosed that the sentencing court's comments were derived entirely from Wilson's history of behavior as disclosed in the PSI. As to Wilson's claim that his sentence was an unconstitutional *de facto* life sentence, the appellate court found that the claim was not contained on the face of his *pro se* postconviction petition and that counsel had instead attempted to extrapolate it from Wilson's claim of judicial bias. Accordingly, the court held that the eighth amendment claim was forfeited. *Id.*

¶ 19　　On March 27, 2020, Wilson filed the *pro se* motion for leave to file a successive postconviction petition that is at issue here. In his motion and accompanying petition, Wilson raised both an eighth amendment claim (U.S. Const., amend. VIII) and a proportionate penalties clause claim under the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11). With respect to his eighth amendment claim, Wilson maintained that under *Miller* and *People v. Holman*, 2017 IL 120655, a sentencing court must make a finding of permanent incorrigibility and must specifically address the attendant characteristics of youth discussed in *Miller* before sentencing a juvenile offender to life in prison. Wilson further maintained that, under *People v. Buffer*, 2019 IL 122327, a prison sentence of 40 years or more constitutes a *de facto* life sentence that triggers these protections. Wilson contended that his sentencing court had not followed these procedures when imposing sentence and had therefore violated the eighth amendment. The circuit court denied Wilson leave to file his petition.

¶ 20　　On appeal, the appellate court reversed the circuit court's judgment and remanded for a new sentencing hearing with directions that the court consider Wilson's youth and its attendant characteristics. 2021 IL App (3d) 200181-U, ¶ 16. The appellate court concluded that Wilson's *Miller*-based claim satisfied the cause and prejudice test. *Id.* Specifically, Wilson established cause because he could not have raised his claim prior to the decisions in *Miller*, *Holman*, and *Buffer*. *Id.* Further, Wilson established prejudice because a review of the record demonstrated the sentencing court did not make a finding that Wilson was permanently incorrigible and did not specifically address Wilson's youth and attendant characteristics when it sentenced him to a *de facto* life sentence. *Id.* Thus, the appellate court concluded Wilson was entitled to postconviction relief. *Id.* Having granted Wilson relief on his eighth amendment claim, the court did not address the proportionate penalties clause claim. This appeal followed. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 21　　　　　　　　　　　　　　　　　ANALYSIS

¶ 22　　The Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy for criminal defendants who have suffered substantial violations of their constitutional rights at trial. *People v. Taliani*, 2021 IL 125891, ¶ 53. A

postconviction proceeding is a collateral attack on a final judgment, and constitutional issues that were raised and decided on direct appeal are barred from postconviction consideration by the doctrine of *res judicata*, while issues that could have been raised, but were not, are forfeited. *Id.*

¶ 23 Both the Act and our caselaw make clear that the filing of only one postconviction petition is contemplated. *Id.* However, there are two exceptions where fundamental fairness requires that the bar against successive petitions be lifted. *Id.* ¶¶ 54-55. The first is the "cause and prejudice" exception, which has been codified in the Act (725 ILCS 5/122-1(f) (West 2016)). *Taliani*, 2021 IL 125891, ¶ 55. Under this exception, a petitioner must demonstrate both "cause" for the failure to raise a claim in the initial petition and "prejudice" resulting from that failure. *People v. Lusby*, 2020 IL 124046, ¶ 27. The second exception is the " 'fundamental miscarriage of justice' " exception, which requires a petitioner to make a persuasive showing of actual innocence (*Taliani*, 2021 IL 125891, ¶ 55) and does not require a showing of cause and prejudice (*id.* ¶ 58). Under either exception, the petitioner must first obtain leave of court to file a successive petition. *Id.*

¶ 24 In this case, the sole issue presented is whether the circuit court should have granted Wilson leave to file his successive petition because he satisfied the cause and prejudice standard with respect to his eighth amendment claim. To establish "cause" a petitioner must identify "an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f)(1) (West 2016). To establish prejudice, a petitioner must show that the claim not raised during the initial proceeding so infected the trial that the resulting conviction or sentence violated due process. *Id.* § 122-1(f)(2); *Lusby*, 2020 IL 124046, ¶ 27. Our review of these issues is *de novo*. *Id.*

¶ 25 The State contends that the circuit court properly denied Wilson leave to file his successive postconviction petition because he failed to establish either cause or prejudice. We need not address the State's arguments regarding cause because, for the following reasons, it is clear that Wilson has not established prejudice. See, *e.g.*, *People v. Guerrero*, 2012 IL 112020, ¶ 15 (both prongs of the cause and prejudice standard must be met).

¶ 26    In *Miller*, the United States Supreme Court held that the eighth amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Court found that such sentencing schemes were constitutionally flawed because juveniles "are constitutionally different from adults for purposes of sentencing" (*id.* at 471) and mandatory sentencing schemes, "by their nature, preclude a sentencer from taking account of [those differences]" (*id.* at 476). The Court explained that, by making irrelevant the "offender's age and the wealth of characteristics and circumstances attendant to it" (*id.*), mandatory life-without-parole sentencing schemes simply pose "too great a risk of disproportionate punishment" (*id.* at 479).

¶ 27    The Court in *Miller* did not categorically prohibit life sentences for juvenile offenders. Rather, the Court held that such sentences must be based on a process employing judicial discretion rather than statutory mandates and that sentencing courts must take into account how an offender's youth and attendant circumstances "counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. The Court also highlighted some of these attendant circumstances: the youth's chronological age and its "hallmark features," including "immaturity, impetuosity," and the "failure to appreciate risks and consequences"; the circumstances of the offense, including the extent of the juvenile's participation and whether familial or peer pressure may have affected the juvenile; and the juvenile's individual circumstances, including his family and home environment, his rehabilitative potential, and whether he was able to meaningfully participate in the trial process. *Id.* at 477-78.

¶ 28    Subsequently, in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Supreme Court held that *Miller* had announced a new rule that applied retroactively to state cases on collateral review. In so holding, the Court repeated *Miller*'s determination that juveniles " 'are constitutionally different from adults for purpose of sentencing.' " *Id.* at 206 (quoting *Miller*, 567 U.S at 471). The Court also reiterated that *Miller* "requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 209-10 (citing *Miller*, 567 U.S. at 483). *Montgomery* further emphasized that a life sentence without parole is permitted only for "the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible" (*id.* at 208), juvenile offenders "whose crimes reflect permanent

incorrigibility" (*id.* at 209), and "those rare children whose crimes reflect irreparable corruption" (*id.*).

¶ 29 This court addressed the scope of *Miller* and *Montgomery* in *Holman*, 2017 IL 120655. In *Holman*, the principal question was whether *Miller* and *Montgomery* had any application to juvenile life sentences imposed under a discretionary sentencing scheme. *Id.* ¶ 34. This court noted that a handful of cases from other jurisdictions had read *Miller* and *Montgomery* as holding only that mandatory juvenile life sentencing schemes were unconstitutional. *Id.* ¶ 40. However, this court rejected that contention, stating that "*Miller* contains language that is significantly broader than its core holding" and that "[n]one of what the Court said is specific to only mandatory life sentences." *Id.* ¶ 38. *Holman* therefore determined that the principles of *Miller* and *Montgomery* applied with equal force to life sentences for juvenile offenders imposed under a discretionary sentencing scheme. *Id.* ¶ 40.

¶ 30 *Holman* held that, under *Miller* and *Montgomery*, a juvenile offender may be sentenced to life in prison under a discretionary sentencing scheme only "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. *Holman* further concluded that the Supreme Court's admonition that the eighth amendment requires a sentencer to "consider a juvenile offender's youth and attendant characteristics" meant that the sentencing court may impose a life sentence only after specifically addressing the characteristics of the offender's youth discussed in *Miller*. These "*Miller* factors" included, but were not limited to,

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*

¶ 31    Following *Holman*, this court held in *Buffer* that a prison sentence of 40 years or more constitutes a *de facto* life sentence that triggers the protections of *Miller* and *Holman*. *Buffer*, 2019 IL 122327, ¶ 41. This court summarized the governing principles, stating that

> "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27.

¶ 32    Relying on the holdings of *Miller*, *Holman*, and *Buffer*, the appellate court in the case at bar concluded that Wilson had established prejudice for purposes of the cause and prejudice test. The appellate court noted that Wilson had been sentenced to a total of 59 years' imprisonment and had thus a received a *de facto* life sentence pursuant to *Buffer*. The appellate court then concluded that the sentencing court had violated the eighth amendment because it did not properly "consider defendant's youth and its attendant characteristics" before sentencing Wilson. 2021 IL App (3d) 200181-U, ¶ 16. That is, the sentencing court did not make a finding of permanent incorrigibility and did not specifically address the *Miller* factors, as required by this court's decision in *Holman*. For this reason, the appellate court vacated Wilson's sentence and remanded the cause to the circuit court for a new sentencing hearing.

¶ 33    Before this court, the State contends that the appellate court's prejudice analysis is incorrect. According to the State, the appellate court erred in relying on *Holman* because the rule announced in that decision has been abrogated by the United States Supreme Court's opinion in *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021).

¶ 34    In *Jones*, the defendant argued that a sentencer who imposes a discretionary life sentence without the possibility of parole on a minor must make a separate factual finding that the minor defendant is permanently incorrigible or, at the least, "provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility." *Id.* at ___, ___, 141 S. Ct. at 1311, 1313. The United States Supreme Court rejected both these arguments, finding that neither *Miller* nor *Montgomery* required such findings. *Id.*

¶ 35 *Jones* explained that *Miller* "declined to characterize permanent incorrigibility as *** an eligibility criterion." *Id.* at ___, 141 S. Ct. at 1315. Rather, it "required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence" but "did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence." *Id.* at ___, 141 S. Ct. at 1316. Similarly, *Jones* noted that in *Montgomery* the Court expressly stated that " '*Miller* did not impose a formal factfinding requirement' " and added that " 'a finding of fact regarding a child's incorrigibility … is not required.' " *Id.* at ___, 141 S. Ct. at 1313 (quoting *Montgomery*, 577 U.S. at 211).

¶ 36 The United States Supreme Court also rejected the defendant's alternative argument that an on-the-record sentencing explanation with an implicit finding of incorrigibility was constitutionally required. The *Jones* Court noted that *Miller* "did not even hint at requiring an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility" and, if it believed such an explanation was constitutionally necessary, it surely would have said so. *Id.* at ___, 141 S. Ct. at 1320. In addition, the *Jones* Court stated that an on-the-record sentencing explanation was "not necessary to ensure that a sentencer considers a defendant's youth," as *Miller* required. *Id.* at ___, 141 S. Ct. at 1319. The *Jones* Court explained that, "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." (Emphasis in original.) *Id.* at ___, 141 S. Ct. at 1319.

¶ 37 The United States Supreme Court emphasized in the *Jones* case that, although one sentencer might weigh the defendant's youth differently than another, the "key point remains" that "a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor." *Id.* at ___, 141 S. Ct. at 1319-20.

¶ 38 The Court in *Jones* thus held that neither a finding of permanent incorrigibility nor an on-the-record sentencing explanation is constitutionally required before a juvenile may be sentenced to life without parole. Instead, "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at ___, 141 S. Ct. at 1313. Accordingly, unless a

- 11 -

sentencing court "expressly refuses as a matter of law to consider the defendant's youth (as opposed to, for example, deeming the defendant's youth to be outweighed by other factors or deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case)" (*id.* at ___ n.7, 141 S. Ct. at 1320 n.7), a discretionary sentencing scheme, in itself, satisfies *Miller*'s requirement that sentencing courts account for youth and its attendant circumstances. As the *Jones* Court stated, "[t]he key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id.* at ___, 141 S. Ct. at 1318.

¶ 39    Notably, this court has previously recognized the import of *Jones* on the holding of *Miller*. See, *e.g.*, *People v. Clark*, 2023 IL 127273, ¶ 71 (noting that in *Jones* "the Court clarified that the holding in *Miller* does not apply to discretionary life sentences where the sentencing court does have discretion to consider youth and attendant characteristics at sentencing"); *People v. Dorsey*, 2021 IL 123010, ¶ 66 (*Jones* states that a sentencing decision imposed where "the trial court had discretion to consider defendant's youth and impose less than a *de facto* life sentence" complies with *Miller*); *People v. Jones*, 2021 IL 126432, ¶ 28 (citing *Jones* and noting that "*Miller*'s additional protections for juvenile offenders apply only when a trial court lacks, or refuses to use, discretion in sentencing a juvenile offender to a life, or *de facto* life, sentence").

¶ 40    Other courts have understood *Jones* similarly and have concluded that "no viable *Miller* claim exists, 'so long as the sentence is not mandatory—that is [ ] so long as the sentencer has discretion to consider the mitigating qualities of youth and impose a lesser punishment.' [Citation]." *Commonwealth v. Felder*, 269 A.3d 1232, 1243 (Pa. 2022); see also *United States v. Grant*, 9 F.4th 186, 196-97 (3d Cir. 2021) (*en banc*) (same); *United States v. Friend*, 2 F.4th 369, 378 (4th Cir. 2021) (same); *Holmes v. State*, 859 S.E.2d 475, 480-81 (Ga. 2021) (same); *Williams v. State*, 500 P.3d 1182, 1186-87 (Kan. 2021) (same).

¶ 41    Given the United States Supreme Court's decision in *Jones*, the State contends in this case that this court's decision in *Holman* no longer accurately reflects eighth amendment law. See *Dorsey*, 2021 IL 123010, ¶ 41 (noting that *Holman* "is

- 12 -

questionable in light of *Jones*"). Therefore, according to the State, the appellate court's prejudice analysis was incorrect. We agree.

¶ 42        "[W]hen the Supreme Court adopts a particular framework for applying a federal constitutional provision, we are required to follow that framework, regardless of how other courts, including this one, may have approached the issue in other decisions." *People v. Hood*, 2016 IL 118581, ¶ 22. *Holman*'s holding that a juvenile offender's discretionary life sentence does not comport with the eighth amendment unless the sentencing court first makes a finding of permanent incorrigibility after specifically addressing the "*Miller* factors" is *directly* at odds with the holding in *Jones*—specifically, that additional findings are not required, in that a discretionary sentencing scheme that allows a court to consider youth and its attendant characteristics is "constitutionally sufficient" (*Jones*, 593 U.S. at ___, 141 S. Ct. at 1313). Accordingly, *Holman* is overruled.

¶ 43        Wilson also cites *State v. Kelliher*, 381 N.C. 558, 2022-NCSC-77, in support of his contention that he has established prejudice with respect to his eighth amendment claim. In *Kelliher*, the Supreme Court of North Carolina addressed a situation where the sentencing court had sentenced a juvenile offender to a *de facto* life sentence after making an express finding that the offender was " 'neither incorrigible nor irredeemable.' " *Id.* ¶ 2. After reviewing the United States Supreme Court's juvenile sentencing cases, including *Miller*, the North Carolina Supreme Court concluded that those cases set forth a substantive, eighth amendment rule that "categorically prohibits a sentencing court from sentencing any juvenile to life without parole if the sentencing court has found the juvenile to be 'neither incorrigible nor irredeemable.' " *Id.* ¶ 38. *Kelliher* has no application here, since the sentencing court did not make a finding that Wilson was "neither incorrigible nor irredeemable."

¶ 44        In this case, there is no dispute that Wilson was sentenced under a sentencing scheme that granted the sentencing court the discretion to consider Wilson's youth and attendant circumstances and to impose less than a *de facto* life sentence. In addition, it is clear from the record that the sentencing court did not refuse, as a matter of law, to consider Wilson's youth. At the conclusion of the sentencing hearing, the court stated:

"I'm going to tell you, [defendant], to this report. It's about an inch-and-a-half to two inches. And, normally, when I read a [PSI], normally you can read it and there's some redeeming value, there's something good. You can see some rehabilitation potential. I have to tell you, I started to tag the pages. And page after page after page after page, there is not one page that I can think of in this entire [PSI] that doesn't talk about how bad you are.

Does it mention that you have ADHD? It does. That you have defiance disorder, that you have impulsive behavior, hyperactivity, possibly some mild retardation? It does. And it gives you those labels. But the entire [PSI] talks about how you didn't make it anywhere, quite frankly. And it wasn't because of other people, it was because of yourself. You were basically noncompliant, a bully, disrespectful, in every place you ever ended up. You made certain that everybody there, you know, was—was miserable around you.

There is not one page—I can pick any one page, and it's terrible. Absolutely terrible each and every place that you were at. And these are things that you just did purposely all the time, whether you were in a facility, or whether you were in the school room, or whether you were in an alternate school. Your behavior never was good—never, ever. And so the problem is when I look at you, even though you're young, the past tells you a lot about the future. And this shows you to be a very dangerous person, quite frankly. You don't care. You don't care who you hurt. You don't care what the rules are. And you don't care who's making the rules, because you're not gonna abide by those rules. That's what every one of these pages say, that you simply are not going to abide by the rules. And I—I don't believe that will change. I know you're young. But, you know, this is a significant—even though you're young—significant account of your young years. And, as I said, each page. I can't pick one page out of here that says one—even one thing good about you. Like I said, from the schools to the rehabilitation to the people that have worked for you.

So I do believe you're a danger to society. I believe you will continue to be a danger to society. I'm not sure there's any rehabilitation factor there that you're gonna follow. I guess you can prove me wrong when you are in prison. But there is nothing in here that says you're going to turn your life around. Everything in here says you basically don't have a conscience, and you're

gonna do what you want to do. And if it causes danger to others, you're gonna do that. And we saw that on the night of December 27th when we heard the facts that, you know, you yelled out that it was gonna be a robbery. Ryan Graefnitz turns around and runs away. At that point you could have just let him run. Nothing had happened. But you decided to shoot—you and Byron Moore decided that you're gonna shoot him in the back and leave him for dead and drive off and go talk to your friends and do whatever else you wanted to do and leave him lay in that street. And I can consider that.

So, I am going to sentence you to 40 years on first degree murder with an additional 15. So that's going to be 55 years there. I am going to give you—and the State recommended, and I will do that—on the attempt armed robbery, the minimum on that, other than probation, is 4 years. So I am going to give him 4 years, which is the minimum prison time on that. And the 4 years is at 50 percent.

Now, on the Class 1 attempt robbery, that will be followed by 2 years mandatory supervised release, possible fine up to $25,000. As to the first degree murder, the 40 years plus the add-on of 15. When you get out of prison, it will—but you're gonna be a very old man. So—you know, and I hope sitting in prison will change your ways. I'm just afraid it won't. I'm afraid you're gonna get out and still be dangerous and still have no conscience. I hope I'm wrong. But after you serve that 55 years, 40 plus 15, it will be followed by 2 years mandatory supervised release, or what used to be called parole. As I said, so the record's real clear, there's no such thing as probation, obviously, on a first degree murder, which is served at 100 percent. I could give you probation on the attempt armed robbery. However, I'm not. I'm giving you the 4 years, which is 50 percent. But I just wanted to—I just want to make known to the higher courts that I know I could give you probation."

The sentencing court reviewed the entire PSI, which contained extensive evidence regarding Wilson's developmental age, maturity, and other circumstances, and announced several times that Wilson was young. Wilson thus received the constitutionally required procedure under *Miller*. That being the case, Wilson cannot establish prejudice, and the circuit court correctly denied him leave to file

his eighth amendment claim. We therefore reverse the judgment of the appellate court awarding Wilson a new sentencing hearing under the eighth amendment of the United States Constitution.

¶ 45                                    Proportionate Penalties

¶ 46     Because the appellate court granted relief to Wilson on his eighth amendment claim, it did not address his additional contention that he was entitled to relief under the proportionate penalties clause of the Illinois Constitution. See Ill. Const. 1970, art. I, § 11. Accordingly, we remand this cause to the appellate court to address whether Wilson has satisfied the cause and prejudice test with respect to his proportionate penalties clause claim. See, *e.g.*, *People v. Lowery*, 178 Ill. 2d 462, 473 (1997) ("where trial errors were raised but not ruled upon in the appellate court, it is appropriate for this court to remand the cause to the appellate court for resolution of those remaining issues").

¶ 47                                          CONCLUSION

¶ 48     For the foregoing reasons, the judgment of the appellate court granting Wilson relief on his eighth amendment claim and awarding him a new sentencing hearing is reversed. The cause is remanded to the appellate court to address whether Wilson has satisfied the cause and prejudice test with respect to his proportionate penalties clause claim.

¶ 49     Appellate court judgment reversed.

¶ 50     Cause remanded.

¶ 51     JUSTICES ROCHFORD and O'BRIEN took no part in the consideration or decision of this case.