2026 IL App (1st) 220373-B

FIFTH DIVISION
January 23, 2026

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-0373

| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 12003 |
| | ) | |
| TONY CAMPBELL, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices C.A. Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1     After this court vacated his initial 140-year sentence, defendant Tony Campbell was resentenced in 2009 to 110 years in prison for first degree murder and armed robbery, offenses committed when he was just 17 years old. Under the statutory sentencing scheme then in place, the shortest sentence the court could impose on remand was just over 50 years.

¶ 2     Since then, the law governing juvenile sentencing has changed significantly. In 2012, the United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460, 465, 479 (2012), that a mandatory sentence of life without parole for a juvenile violates the eighth amendment's prohibition on cruel and unusual punishments. Several years later, our own supreme court held in *People v. Reyes*, 2016 IL 119271, ¶ 10, that the same is true where a juvenile has received a lengthy

term-of-years sentence that is the functional equivalent of a natural life sentence.

¶ 3    Based on these authorities, in 2019, Tony sought leave to file a successive postconviction petition challenging the constitutionality of his 110-year sentence. The circuit court denied his motion. It agreed that Tony had received a *de facto* life sentence but concluded that his resentencing hearing, held three years before *Miller* was decided, had nevertheless been *Miller-*compliant.

¶ 4    The State acknowledges on appeal that because the minimum sentence available by statute was a *de facto* life sentence, the sentencing scheme applied here "violated the Eighth Amendment under *Miller*." It urges us to conclude, however, that this was harmless because Tony received well above the minimum sentence. The State's rationale, in other words, is that it is clear from the record that even if the trial judge had been given the discretion to impose something less than a life sentence, he would not have done so.

¶ 5    But as our supreme court recently reemphasized in *People v. Wilson*, 2023 IL 127666, the core takeaway from *Miller* and the cases that have followed it is that sentencing a child to die in prison must be an exercise of *real discretion*. Crucially, the sentencing court must have the ability to impose something less than a life sentence. Where, as here, the minimum sentence available is a sentence deemed by our supreme court to be the legal and functional equivalent of a natural life sentence, there can be no constitutionally significant exercise of discretion.

¶ 6    We reverse the circuit court's denial of Tony's motion for leave to file a successive postconviction petition, vacate his sentence, and remand for resentencing.

¶ 7                                  I. BACKGROUND

¶ 8                        A. Charges, Pretrial Proceedings, and Trial

¶ 9    The State alleged that 17-year-old Tony and 18-year-old Melvin Gaddy shot and killed

their mutual friend, Garvey Bernard, and robbed him of $3500. Mr. Gaddy pleaded guilty and was sentenced to 25 years in prison. Tony was offered but declined a sentence below the mandatory minimum sentence.

¶ 10    Tony was allowed to represent himself at trial. The evidence, summarized at length in our earlier decisions, consisted of Tony's statement to the police and the testimony of two eyewitnesses. It generally showed that, just before his death, Mr. Bernard had boasted about a $3500 insurance settlement he received from a car accident, prompting three of his friends—Tony, Mr. Gaddy, and a third individual—to form a plan to rob him. On April 10, 2001, they brought Mr. Bernard to the alley outside Mr. Gaddy's apartment, where Tony was also living. Mr. Gaddy and Tony went up to the apartment on the pretense of getting a magazine that listed cars for sale. They returned with a gun, and Tony told Mr. Bernard to "give it up." When Mr. Bernard ran, Tony began shooting him. Mr. Gaddy then took the money from Mr. Bernard's pockets and scaled a nearby fence, while Tony stood over Mr. Bernard and shot him again. The medical examiner testified that Mr. Bernard was shot a total of 11 times.

¶ 11    The jury found Tony guilty of first degree murder and armed robbery. It also found that he had personally discharged the firearm that caused Mr. Bernard's death.

¶ 12                        B. Initial Sentencing and First Direct Appeal

¶ 13    The public defender was reappointed to represent Tony at sentencing and presented two witnesses in mitigation: Tony's mother, Bonnie Campbell, and his sister, Tamika Campbell Thompson.

¶ 14    Ms. Campbell testified that Tony's father "never had any part of [his] life" and never provided them with financial support. His stepfather was cruel to Tony and Tony's sister and "didn't accept them because they weren't his own." Ms. Campbell eventually ended the

3

relationship because of this. Tony also had a hard time academically and socially. He was picked on by his classmates. Ms. Campbell explained that when Tony went to live with his friend, Melvin Gaddy, Mr. Gaddy's influence on his life was "[v]ery bad." Tony was afraid to go home some nights because Mr. Gaddy would be "high or drunk" and "very violent." She described her son as "always sweet and very polite and well mannered." He never disrespected her, and she had never seen him be violent.

¶ 15    Ms. Thompson, who was three years older than Tony, agreed that her brother was picked on in school and added that she often had to intercede on his behalf. Tony never joined a gang, but he used to run home crying because gang members chased him and aggressively tried to recruit him. Like her mother, Ms. Thompson had also never seen Tony behave violently.

¶ 16    According to the pretrial investigation report, Tony's mother and father were never married, and he rarely saw his father growing up. Tony's stepfather, a security officer for the Chicago Housing Authority, physically abused him. Tony was expelled from school at the end of ninth grade because of excessive absenteeism. He explained that it was a " 'bad school' with a lot of 'gang bangers.' " Tony was diagnosed with dyslexia and attention deficit hyperactivity disorder (ADHD) in third grade and placed in special education classes. He first consumed alcohol when he was 12 years old and began smoking marijuana when he was 14. Tony reported that, while incarcerated, he had spent time working in the law library and attending church services. He had one prior juvenile adjudication for a drug offense and no prior adult criminal convictions.

¶ 17    Defense counsel asked the court for leniency, arguing that Tony's refusal to join gangs, despite his difficult upbringing, demonstrated that he had rehabilitative potential. The State conversely asked the court for a harsh sentence, citing the brutal nature of the crime. The sentencing judge, concluding that none of the statutory factors in mitigation applied, sentenced

Tony to 140 years in prison—an aggregate sentence consisting of the maximum sentences of 60 years for first degree murder and 30 years for armed robbery, plus a 50-year firearm enhancement.

¶ 18    Defense counsel moved for reconsideration, arguing among other things that the sentence was excessive in light of Tony's background and youth. The court denied the motion, calling Tony a "cold-blooded murderer" and stating that 140 years in prison was "maybe not enough."

¶ 19    On direct appeal, we remanded for resentencing based on the fact that the sentencing judge had indicated on the record that he viewed Tony as a convicted felon. The trial court had improperly based this on the fact that Tony had been adjudicated delinquent and was serving a period of juvenile probation. *People v. Campbell*, 378 Ill. App. 3d 1119 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20                    C. Resentencing on Remand and Second Direct Appeal

¶ 21    Tony was resentenced on March 25, 2009. The sentencing judge noted at the start of the hearing that he had not been able to find a copy of the pretrial investigation report in the record. He said to defense counsel, "[l]et me have a copy. I will give it back to you in a second." Defense counsel asked the judge to also consider a two-page letter Tony had written, in which he expressed remorse and said he had taken a wrong turn but asked the court to believe that he would "never leave that road again." The judge refused to consider the letter.

¶ 22    The State introduced victim impact statements from Garvey Bernard's parents and presented no other evidence or testimony. It argued that Tony had killed his friend for money, a gruesome act for which he deserved the maximum sentence the judge could impose.

¶ 23    Defense counsel summarized the testimony of Tony's mother and sister from his initial sentencing hearing but did not recall them as witnesses. The family was poor, counsel argued, and their poverty was what motivated Tony to commit this impulsive crime.

¶ 24    Tony's counsel initially represented to the court that he was 18 at the time of his offenses; she was corrected on the record by her client. Tony's decision not to accept a plea deal and to represent himself at trial, counsel posited, demonstrated "that immaturity causes people to make bad decisions." She argued that Tony had matured while incarcerated and noted that there were no reports of any incidents he had been involved in while in prison. Counsel asked the court for the minimum sentence of 51 years, which she observed was already "in effect, a life sentence."

¶ 25    Tony spoke at length in allocution. He began by saying, "I truly am sorry for the loss of Garvey Bernard's family and the life of Garvey Bernard." Although he still maintained that he was not the one who pulled the trigger, he accepted responsibility "for receiving blood money" and for failing to report Mr. Gaddy to the police. He explained to the court that he felt he owed Mr. Gaddy loyalty for taking him in off the streets and that he also "kind of feared [Mr. Gaddy]." Although he was "not good with speeches," Tony told the court, "if I could go back, if I had the power, I would go back and save that man's li[f]e." Tony felt he could be a productive citizen. If given the chance, he said he would speak out to those who, like he had, were "hanging with the wrong people." He believed that he was well positioned to reach young people with the message of what he had learned from his mistakes.

¶ 26    The court asked if Tony had anything else to say before chastising all present for not even "bother[ing] to mention the victim's name" during the "whole record of the sentencing hearing." The court noted that the facts of the case were "pretty outrageous," and that Tony had been convicted as a principle and his co-defendant as an accomplice.

¶ 27    The judge then reviewed the statutory factors in mitigation that are applicable to all defendants, regardless of age, and noted which ones he believed were applicable:

> "Factors in mitigation: The defendant's criminal conduct neither caused nor

threatened serious physical harm to another. Not applicable.

The defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another. Not applicable. The exact opposite, actually.

The defendant acted under a strong provocation. Not applicable.

There were substantial grounds tending to excuse or justify the defendant's criminal conduct though failing to establish a defense. Not applicable.

The defendant and his criminal conduct was induced or facilitated by someone other than the defendant. To some extent I guess this is true. Two people together may commit a crime that one person alone may not, and that is the situation in this case.

Number six, victim compensation. Of course not applicable.

The defendant has no history of prior delinquency or criminal activity. For the most part, that is true.

The defendant's criminal conduct was the result of circumstances unlikely to recur. The defendant actually claims that he would never commit another armed robbery or shoot a guy 11 times, killing him again. I am not certain that that is true.

The character and attitudes of the defendant indicate that he is unlikely to commit another crime. Again, these two factors in mitigation relate to rehabilitative potential, and the defendant claims that he does have rehabilitative potential. But I am inclined to give some points for rehabilitative potential, but there is still a big question mark in my mind whether the defendant actually does have the ability to rehabilitate himself and not commit another crime of this nature.

The other factors in [mitigation] 11, 12 and 13 are not applicable."

¶ 28    He did the same for the statutory factors in aggravation:

"Factors in aggravation. Number one, of course, applicable, the defendant's conduct caused or threatened serious harm.

Number two, the defendant received compensation for committing the offense. Inherent, of course, in the offense of felony murder, which the jury convicted the defendant of and which the defendant vacated the judgment for that offense on a one act one crime theory. Nevertheless, the defendant walked away from the murder scene with money in his pocket.

The defendant has a history of prior delinquency or criminal activity. Not really applicable. Number four, number five, number six are not applicable.

The sentence is necessary to deter others from committing the same crime. Applicable.

The other factors in aggravation are not applicable that are outlined in the statute."

¶ 29   The judge reduced Tony's initial sentence of 140 years to 110 years in prison: 50 years for first degree murder, 25 years for armed robbery, and 35 years as a firearm enhancement. The judge noted that he was "factoring in [Tony's] rehabilitative potential as well as the seriousness of the offense, the deterrent effect requirement and the fact that [Tony] had virtually no criminal background at the time of the offense."

¶ 30   We affirmed that sentence in a second direct appeal, rejecting Tony's argument that the court had again relied on an improper sentencing factor. *People v. Campbell*, 405 Ill. App. 3d 1195 (2011) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 31                    D. Postconviction Proceedings

¶ 32   We affirmed the summary dismissal of Tony's initial postconviction petition, which raised no sentencing errors, in 2014. *People v. Campbell*, 2014 IL App (1st) 120577-U, ¶¶ 28-29.

¶ 33    On September 22, 2016, our supreme court held in *Reyes* that the protections afforded by *Miller* apply where a juvenile offender is sentenced to a lengthy term-of-years sentence that is a *de facto* life sentence. *Reyes*, 2016 IL 119271, ¶ 10. On January 10, 2019, Tony filed a *pro se* motion for leave to file a successive postconviction petition relying on *Miller* and *Reyes*. And on April 18, 2019, while the petition was still pending, our supreme court made clear in *People v. Buffer*, 2019 IL 122327, ¶ 40, that any sentence greater than 40 years is a *de facto* life sentence.

¶ 34    The circuit court denied Tony's petition on January 27, 2022. The judge—who had also served as the sentencing judge—acknowledged that Tony's 110-year sentence was a *de facto* life sentence and that "the only issue [was therefore] whether his sentencing hearing complied with *Miller*." Citing the United States Supreme Court's decision in *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021), he concluded that "a sentence of life without parole is constitutional for a juvenile convicted of murder so long as the [sentencing judge] had the discretion to impose a different sentence." The judge noted that he had exercised his discretion to give Tony a sentence that was "considerably higher than the minimum" and maintained that he had also "heard and considered arguments about [Tony's] youth based upon the same Eighth Amendment principles which would eventually provide the basis of the holding in *Miller*." In the judge's view, Tony's resentencing hearing was thus "*Miller*-compliant," and Tony was "not entitled to a new hearing for a more in-depth consideration of his youth." (Internal quotation marks omitted.)

¶ 35                                   II. JURISDICTION

¶ 36    The circuit court denied Tony's motion for leave to file a successive postconviction petition on January 27, 2022, and Tony filed a timely notice of appeal from that ruling on February 18, 2022. We have jurisdiction over this appeal, pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1,

9

2017), governing appeals from final judgments in postconviction proceedings.

¶ 37                                    III. ANALYSIS

¶ 38     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2018)) allows a

criminal defendant to challenge his or her conviction by establishing that "in the proceedings

which resulted in [the] conviction there was a substantial denial of his or her rights under the

Constitution of the United States or of the State of Illinois or both." The Act contemplates the

filing of only one postconviction petition. *Id.* § 122-1(f); *People v. Pitsonbarger*, 205 Ill. 2d 444,

456 (2002). Claims that were decided on direct appeal or in an earlier postconviction proceeding

are generally barred by the doctrine of *res judicata*, and claims that could have been, but were not,

raised in earlier proceedings are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005). Because

successive postconviction petitions are disfavored (*People v. Bailey*, 2017 IL 121450, ¶ 39), a

defendant seeking to file one must demonstrate either "cause and prejudice" for failing to raise a

claim earlier or actual innocence (*People v. Edwards*, 2012 IL 111711, ¶¶ 22-23). We review a

circuit court's denial of leave to file a successive petition *de novo*. *Bailey*, 2017 IL 121450, ¶ 13.

¶ 39     Here, Tony sought leave under the cause-and-prejudice exception to the general rule

against the filing of successive postconviction petitions. Section 122-1(f) of the Act, which codifies

that exception, provides that a prisoner shows cause by "identifying an objective factor that

impeded his or her ability to raise a specific claim during his or her initial post-conviction

proceedings" and prejudice by "demonstrating that the claim not raised *** so infected the trial

that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2018).

For the reasons that follow, we believe that Tony has shown both cause and prejudice for the filing

of a successive petition.

¶ 40                                   A. Cause

¶ 41    The State makes no argument regarding cause, focusing instead on prejudice. To show cause, Tony relies on recent case law governing the sentencing of juvenile offenders, which has evolved considerably since he was resentenced in 2009 and since his initial postconviction petition was summarily dismissed in early 2012. The cornerstone of this line of cases is the eighth amendment to the United States Constitution, which prohibits excessive punishment, and its application to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV. The United States Supreme Court held in *Miller*, 567 U.S. at 465, that a sentencing scheme mandating life without parole for juveniles violates the eighth amendment's prohibition on cruel and unusual punishments because it deprives the court of the ability to consider the "diminished culpability and heightened capacity for change" inherent in youth. *Id.* at 479.

¶ 42    In 2016, the Illinois Supreme Court extended *Miller*'s holding to include mandatory *de facto* life sentences—sentences so long that they are the functional equivalent of life without parole (*Reyes*, 2016 IL 119271, ¶ 9)—and discretionary life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40). And, as noted above, in 2019, the court defined a *de facto* life sentence as any sentence exceeding 40 years (*Buffer*, 2019 IL 122327, ¶ 40).

¶ 43    Here, *Miller* had not yet been decided when Tony was resentenced on remand in 2009 or when the circuit court dismissed his initial postconviction petition in 2012. And *Reyes* and *Buffer*, which extended *Miller*'s protections to individuals like Tony, who received *de facto* life sentences, would not be decided for several additional years. We agree with Tony that these facts establish cause for the filing of a successive postconviction petition. As we said in *People v. Ross*, 2020 IL App (1st) 171202, ¶ 21, even if a petitioner who had received a *de facto* life sentence had attempted a *Miller* claim in his initial postconviction petition, "it would have been rejected" because it was

not until *Reyes* was decided that his "claim became mature enough so that it could be raised in that context."

¶ 44                                    B. Prejudice

¶ 45     We must next decide whether Tony has demonstrated prejudice by showing that his eighth-amendment rights were violated at his resentencing. Although Tony was sentenced before *Miller* was decided, the United States Supreme Court held in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), that *Miller* had announced a new substantive rule of constitutional law having retroactive effect.

¶ 46     Tony submits three reasons why *Miller* was violated here: (1) the judge had no discretion to sentence him to anything other than a *de facto* life sentence, (2) the judge failed to meaningfully consider the youth-specific factors that three years later would be set out in *Miller*, and (3) the judge made no finding that Tony was permanently incorrigible.

¶ 47     When our initial decision in this appeal was about to be filed, our supreme court issued its opinion in *People v. Wilson*, 2023 IL 127666. While that case raises significant questions about Tony's second and third arguments, it fully supports his contention that, under *Miller* and its progeny, a sentencing court is constitutionally required to have the discretion to impose on a juvenile something other than a life sentence without the possibility of parole.  Because we agree with Tony that the fact that the sentencing court here had no discretion to sentence him to anything less than a *de facto* life sentence requires reversal, we have no need to reach his other two arguments.

¶ 48     The petitioner in *Wilson* was a juvenile who had been given a *de facto* life sentence of 55 years for murder, to be served at 100%, and an additional 4 years for armed robbery. *Id.* at ¶ 15. He sought leave to file a successive postconviction petition on the basis that this sentence had been

imposed without the sentencing court first "making a finding of permanent incorrigibility or specifically addressing the attendant characteristics of youth discussed in *Miller*." *Id*. ¶ 1. The appellate court accepted this claim and granted him leave—based on *Miller, Holman*, and *Buffer*. *Id*. ¶ 20. Our supreme court reversed, finding that the rule announced in *Holman*, which extended the *Miller* line of cases to discretionary sentences "no longer accurately reflects eighth amendment law." *Id*. ¶ 41. It relied on the United States Supreme Court's holding in *Jones*, 593 U.S. ___, 141 S. Ct 1307, which rejected the requirement that either an express or implicit finding of permanent incorrigibility must be made before a sentencing judge imposed a discretionary life sentence without the possibility of parole on a juvenile. *Id*. ¶¶ 33-42.

¶ 49    Key to the result in *Wilson*, where the court affirmed the circuit court's denial of the petitioner's motion for leave, was its observation that there was "no dispute that [he] was sentenced under a sentencing scheme that granted the sentencing court the discretion to consider [his] youth and attendant circumstances *and to impose less than a de facto life sentence*." (Emphasis added.) *Id*. ¶ 44. As the *Wilson* court makes clear, *this* is the discretion that *Miller* requires a sentencing court to have when sentencing a defendant who was a juvenile at the time the crime was committed. So long as the court had this discretion and "it is clear from the record that [it] did not refuse, as a matter of law, to consider [the defendant's] youth," the Eighth Amendment is complied with. *Id*. ¶¶ 42, 44.

¶ 50    There is no dispute that this discretion was lacking at both of Tony's sentencing hearings. The sentencing scheme applied to Tony, with good-conduct credit available only on the armed robbery charge, *mandated* that he receive no less than 51 years in prison, well in excess of the definition of a *de facto* life sentence established in *Buffer*. The sentencing judge thus had no discretion to give Tony any sentence that was not a *de facto* life sentence.

¶ 51    The State candidly acknowledges that this constituted a violation of Tony's eighth amendment rights under *Miller*. It contends, however, that this *Miller* violation was harmless error. The State's position is that a *Miller*-compliant sentencing scheme is not required where the sentence imposed is so far above the statutory minimum that one can surmise that the discretion to impose something less than a life sentence would have made no difference. We reject this argument.

¶ 52    As Tony points out in his reply brief, the State cites no case applying a harmless error analysis in this context. The cases it does cite are all federal cases holding that where a sentencing court "makes an informed and individualized judgment [citation], to sentence a defendant well above any mandatory minimum applicable to his case, *** any error in the identification of the applicable mandatory minimum [is] harmless." (Internal quotation marks omitted.) *United States v. Dominguez*, 393 F. App'x 773, 779 (2d Cir. 2010).

¶ 53    At issue here, however, is more than just a misapprehension of the applicable minimum sentence. Yes, under *Miller* and *Buffer,* the minimum sentence is constitutionally required to be something less than 40 years. But our supreme court's recent decision in *Wilson* confirms that *Miller* guarantees not just a different sentencing range but also mandates that the sentencing court have the discretion to impose something less than a life sentence without the possibility of parole. *Wilson,* 2023 Il 127666, ¶¶ 27, 44.

¶ 54    The holding in *Miller* is rooted in society's growing awareness that even brutal crimes may be, and frequently are, the product of the transient characteristics of youth. As the Supreme Court said there, "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*." (Emphasis added.) *Miller*, 567 U.S. at 472. The Court in *Miller* declined to consider whether a "categorical

bar" on life without parole for juveniles was appropriate (*id.* at 480), but the essence of that opinion was that courts must have the discretion "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* As *Miller* makes clear, consideration of the transient characteristics of youth is only meaningful if the sentencing court has the discretion to give the juvenile offender a sentence that will offer him or her an opportunity for life after prison.

¶ 55    Although the court here exercised a degree of discretion by choosing a sentence between 50 years in prison and statutory natural life, our supreme court's holding in *Buffer*—that any sentence greater than 40 years is the legal equivalent of a natural life sentence—reveals that exercise of discretion to be meaningless under *Miller*. Where the minimum sentence available is more than 40 years, there is simply no constitutionally significant choice to be made.

¶ 56    We recognized this in *People v. Griffin*, 2021 IL App (1st) 170649-U, ¶ 44, where the sentencing court was required to impose three consecutive sentences of 20 years, for a total of 60 years in prison. We noted that because "[f]or a juvenile defendant in Illinois, there is no difference in the eyes of the law between a 60-year sentence and a natural-life sentence," the court was "[b]oxed in." *Id.* ¶¶ 44-45. "[E]ven if [it] could consider [the] defendant's youth and its attendant characteristics, it could not give him any relief." *Id.* ¶ 44. There, as here, "[s]ince the statutory scheme gave the court no discretion to sentence [the] defendant to anything other than a *de facto* natural life sentence, the sentencing scheme, as applied to [that] defendant, conflict[ed] with *Buffer* and *Miller* and violate[d] the eighth amendment." *Id.* ¶ 45. This analysis in *Griffin* is confirmed by our supreme court's recognition in *Wilson* that the critical question is whether the sentencer has discretion to consider the mitigating qualities of youth and impose a punishment that is less than life in prison. *Wilson*, 2023 IL 127666, ¶ 40.

¶ 57    In sum, where both the United States Supreme Court and our own supreme court have repeatedly identified the exercise of real discretion as the essential requirement of *Miller*, we are wholly unpersuaded that we may entertain a harmless error analysis in its absence.

¶ 58    Even if we were convinced that harmless error could be asserted under these circumstances, we would not find its requirements met here. "[T]he test for determining if a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*People v. Thurow*, 203 Ill. 2d 352, 368 (2003)), or, in this case, the sentenced imposed. Thus, application of the harmless error doctrine here would only be appropriate if the State had shown us, beyond a reasonable doubt, that under a constitutionally permissible sentencing scheme allowing the court to choose—based on the *Miller* criteria— between a sentence that was the equivalent of a life sentence without the possibility of parole and one that was not, Tony would still have received a life sentence. This showing is simply not made on this record.

¶ 59    One factor that *Miller* requires a court to consider before it imposes a life sentence is "the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him." Significant evidence was presented here that Tony, who had never experienced a positive male influence, felt beholden to his older co-defendant, Mr. Gaddy, and that his fear of Mr. Gaddy and desire to demonstrate his loyalty may well have influenced his conduct. This evidence undercuts any showing by the State that Tony would still have received a life sentence under *Miller.*

¶ 60    In addition, as the United States Supreme Court observed in *Montgomery*, 577 U.S. at 208, 209, after *Miller,* sentencing a child to life without parole will be "excessive for all but the rare juvenile offender whose crime reflects irreparable corruption" or "permanent incorrigibility."

16

(Internal quotation marks omitted.) While it appears clear now, following *Jones* and *Wilson,* that a finding of permanent incorrigibility is not required before a court chooses to impose a discretionary life sentence on a juvenile (*Jones*, 593 U.S. at ___, 141 S. Ct. at 1318; *Wilson*, 2023 IL 127666, ¶ 42), rehabilitative potential is a core concern of *Miller.* See *Miller*, 567 U.S. at 473 (noting that life without parole "reflects an irrevocable judgment about [an offender's] value and place in society" that is "at odds with a child's capacity for change" (internal quotation marks omitted)).

¶ 61     After noting that Tony's ability to completely turn his life around was "still a big question" the sentencing judge stated on the record that he was "inclined to give some points for rehabilitative potential." And when the judge ultimately decided to reduce Tony's sentence by 30 years, he specifically noted that one of the things he had "factor[ed] in" was Tony's rehabilitative potential. The sentencing court's recognition that Tony had rehabilitative potential undercuts any suggestion, let alone provides proof beyond a reasonable doubt, that a trial court exercising the sentencing discretion that *Miller* requires would have given him a life sentence.

¶ 62     Because the sentencing scheme here mandated a *de facto* life sentence, Tony's eighth amendment rights were not honored. We conclude that he has established both cause and prejudice for the filing of his successive postconviction petition, and the circuit court's order denying him leave to do so is reversed.

¶ 63                                    C. Remedy

¶ 64     When we reverse an order denying a motion for leave to file a successive postconviction petition, the usual remedy is to remand the case for further postconviction proceedings. See, *e.g.*, *People v. Wrice*, 2012 IL 111860, ¶ 87 (remanding for appointment of postconviction counsel and second-stage proceedings). Where no factual development of the record is necessary to determine

that a *Miller* violation has occurred, however, the proper remedy is instead "to vacate [the] defendant's sentence and to remand for a new sentencing hearing." *Buffer*, 2019 IL 122327, ¶¶ 45-47 (remanding for resentencing following reversal of the summary dismissal of a postconviction petition alleging a *Miller* violation). That is true here, and we therefore remand this case for a new sentencing hearing.

¶ 65                    D. Assignment to a New Judge on Remand

¶ 66    In our initial decision resolving this appeal, filed on June 2, 2023, we remanded to the presiding judge of the criminal division of the circuit court to reassign this case to a different judge for resentencing. We did this with little discussion or explanation. The State petitioned for leave to appeal that aspect of our decision to the Illinois Supreme Court and, with the petition still pending, our supreme court remanded to us for the limited purpose of explaining the rationale for our directive to order reassignment. We did so, in a modified opinion filed on October 13, 2023. *People v. Campbell*, 2023 IL App (1st) 220373.

¶ 67    In that modified decision, we noted that Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) had been interpreted to include the power to order that a case be reassigned to a different judge on remand. *Id.* ¶ 67 (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002)). And although Rule 366 was contained in the civil appeal rules, we concluded that it had a counterpart in Rule 615(b)(2), which is a part of the criminal appeal rules, and which provides that the appellate court may "set aside, affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken" (Ill. Sup. Ct. R. 615(b)(2) (eff. Jan. 1, 1967)). *Id.*

¶ 68    The State's position was that the only valid basis for reassignment on remand in a criminal case was a finding of bias or actual prejudice on the part of the trial judge. While that was clearly

one important basis for reassignment (see *Eychaner*, at 279-81), we concluded in our modified decision that factors other than bias might, in rare cases, also require reassignment. *Id.* ¶¶ 68-69 (citing *People v. Heider*, 231 Ill. 2d 1, 25 (2008) (ordering remand "to remove any suggestion of unfairness") and *People v. Robinson*, 2021 IL App (1st) 171371, ¶ 61 (ordering remand "to avoid the appearance of any impropriety" and "[o]ut of an abundance of caution")). We observed that Federal intermediate appellate courts had long considered such factors. *Id.* ¶ 70 (citing *Manley v. Rowley*, 847 F.3d 705, 712 (2017)).

¶ 69      As we explained in our modified decision, the transcript of Tony's resentencing hearing indicated that, even had he possessed the discretion to do so, the sentencing judge would not have considered giving Tony anything less than a *de facto* life sentence. *Id.* ¶ 74. We also questioned whether this judge, who in other cases had expressed an aversion to applying the more lenient juvenile sentencing standards that are now required (see *People v. McKinley*, 2020 IL App (1st) 191907, ¶¶ 80, 90), could reasonably be expected to fairly consider modifying the sentence in this case in light of those new standards. *Id.* ¶¶ 75-76. We concluded that reassignment was necessary to remove any doubt regarding the fairness of what would be the third, and hopefully final, sentencing hearing on the same criminal charges. *Id.* ¶ 79. We noted that, even if our supreme court were to hold that actual bias was the only basis on which we could order reassignment on remand, "reassignment here would still be supported by the record." *Id.* ¶ 78.

¶ 70      On August 28, 2025, our supreme addressed the question of when this court may order that a criminal case be reassigned to a new judge on remand in *People v. Class*, 2025 IL 129695. The court denied the State's petition for leave to appeal in this case on November 26, 2025, and remanded for us to vacate that portion of our modified opinion ordering reassignment on remand and to consider that issue once more, this time in light of *Class*. We do so now.

19

¶ 71    The court recognized in *Class* that Rule 615(b) does give this court the authority in criminal cases to direct that a new judge be assigned on remand *Id.* ¶ 31. But it concluded that the circumstances under which we may do so are particularly limited where, as in *Class* and in this case, the remand to a different judge is ordered *sua sponte* and in a case that is before the court on a successive petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)). In these circumstances, remand to a different judge is appropriate only were "the record on appeal clearly reveals bias, the probability of bias, or prejudice on the part of the trial judge." *Id.* ¶ 37. Our supreme court went on to define bias and prejudice for these purposes quite narrowly.

¶ 72    We had concluded that the circuit court judge in *Class* was biased based on his demonstrated hostility to the postconviction claims advanced by the petitioner in that case. *Id.* ¶ 43. Our supreme court rejected that notion of bias in favor of a narrower definition that looked to whether the court's decision was derived from an extrajudicial source or displayed such "a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* ¶ 44. The court provided three examples of circumstances in which it had found bias, the probability of bias, or prejudice in a postconviction proceeding: (1) where the judge had knowledge outside the record of the truth or falsity of the allegations, such that he or she might be called as a material witness, (2) where the judge had "a direct, personal, or pecuniary interest in the case," and (3) where the case "involve[d] a possible temptation such that the average person, acting as judge, could not hold the balance nice, clear, and true between the State and petitioner." (Internal quotation marks omitted.) *Id.* ¶ 45.

¶ 73    Here, as in *Class*, none of these very specific circumstances are present. Nor does the record support a finding that the trial judge's decision was derived from an extrajudicial source or displayed an attitude that made fair judgment "impossible." Thus, under the standard articulated

in *Class* for a *sua sponte* reassignment on remand in a successive post-conviction proceeding, reassignment is not supported by the record in this case.

¶ 74                                    IV. CONCLUSION

¶ 75    We reverse the denial of Tony's motion for leave to file a successive postconviction petition, vacate his 110-year sentence, and remand this case for resentencing.

¶ 76    Reversed and remanded.

*People v. Campbell*, 2023 IL App (1st) 220373

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 01-CR-12003, the Hon. Kenneth J. Wadas, Judge presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Joseph Michael Benak, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Retha Stotts, Assistant State's Attorneys, of counsel), for the People. |